UNITED STATES of America, Plaintiff,

John F. Knight, Jr., et al., individually and on behalf of others similarly situated, Plaintiffs-Intervenors,

Board of Trustees of Alabama State University and Alabama A & M University, Realigned Plaintiffs,

v.

The STATE OF ALABAMA; George C. Wallace, Governor of the State of Alabama; the Alabama State Board of Education; Wayne Teague, State Superintendent of Education; Auburn University, a public corporation; Jacksonville State University, a public corporation; Livingston University, a public corporation; Troy State University, a public corporation; the University of Montevallo, a public corporation; the Board of Trustees for the University of Alabama, a public corporation; the University of North Alabama, a public corporation; the University of South Alabama, a public corporation; the Alabama Commission on Higher Education; and the Alabama Public School and College Authority, Defendants.

Civ. A. No. 83–C–1676–S.

United States District Court,
N.D. Alabama, S.D.

Dec. 7, 1985.

Frank W. Donaldson, Caryl P. Privett, William French Smith, Atty. Gen., Wm. Bradford Reynolds, Asst. Atty. Gen., Nathaniel Douglas, Franz Marshall, Jeanne K. Pettenati, Levern M. Younger, Angela Schmidt, Jeremiah Glassman, Pauline A. Miller, Dept. of Justice, Washington, D.C., for plaintiffs.

Ronald W. Wise, Joan Van Almon, Ira De Ment, De Ment & Wise, Montgomery, Ala., for Wallace and Alabama Com'n of Higher Educ. & Al Public School & College Authority.

Walter J. Merrill, Anniston Ala., for Jacksonville State University.

Joe R. Whatley, Jr., John C. Falkenberry, Falkenberry, Whatley & Heidt, Birmingham, Ala., for Board of Trustees for Alabama A & M.

Donald V. Watkins, Watkins, Carter & Knight, Montgomery, Ala., James U. Blacksher, Larry T. Menefee, Blacksher, Menefee & Stein, Mobile, Ala., for intervenors.

Fred D. Gray, Gray, Langford, Sapp, Davis & Mc Gowan, Tuskegee, Ala., Robert J. Lipshutz, Lipshutz, Frankel, Greenblatt, King & Cohen, Atlanta, Ga., for intervenors amicus curiae: The National Bar Ass'n and The American Jewish Congress.

William F. Gardner, Cabaniss, Johnston, Gardner, Dumas & O'Neil, Birmingham, Ala., Joseph J. Levin, Jr., Sanford, Adams, McCullough & Beard, Washington, D.C., for defendant-intervenor, University of Alabama Huntsville Foundation.

Alan R. Engel, Engel & Smith, Mobile, Ala., Maxey J. Roberts, University of South Alabama, Mobile, Ala., for University of South Alabama.

Richard F. Calhoun, Brantley & Calhoun, Troy, Ala., for Troy State University.

J. Fredric Ingram, William F. Murray, Jr., Thomas, Taliaferro, Forman, Burr & Murray, Birmingham, Ala., for Livingston University.

J. Scott Green, Carl E. Johnson, Jr., Burgin Kent, Birmingham, Ala., Frank Ellis, Jr., Wallace, Ellis, Head & Fowler, Columbiana, Ala., for University of Montevallo.

C. Glenn Powell, Robert L. Potts, University, Ala., for Board of Trustees of University of Alabama.

Demetrius C. Newton, Birmingham, Ala., for intervenors the University Legal Defense Fund and the National Alumni Normalite Ass'n.

J. Richmond Pearson, Birmingham, Ala., for proposed intervenors Oscar Williams, Jr. and R. Franklin Williams.

Charles S. Coody, Jeffery A. Foshee, State Dept. of Educ., Montgomery, Ala., for Wayne Teague, Superintendent of Educ. for State of Alabama and Alabama State Bd. of Educ.

John Richard Carrigan, Edward S. Allen, Balch, Bingham, Baker, Ward, Smith, Bowman & Thagard, M. Stanford Blanton and David R. Boyd, Birmingham, Ala., Thomas W. Thagard, Jr., Montgomery, Ala., Thomas D. Samford, III, Samford & Samford, Opelika, Ala., for Auburn University.

T. Michael Putnam, Ernest Blasingame, Potts, Young, Blasingame & Suttle, Florence, Ala., for University of North Alabama.

Solomon S. Seay, Jr., Terry Davis, Montgomery, Ala., for Board of Trustees for Alabama State.

Robert W. Rieder, Jr., John O. Cates, University of Alabama in Huntsville, Ala.

Armand Derfner, Charleston, S.C., for Alabama State University.

Charles Self, University of Alabama in Birmingham, Ala.

OPINION OUTLINE

Introduction .................................. 1140
 I. The Historical Development of the

Dual System of Higher Education ........ 1140
 A. University of Alabama ............... 1140
 Autherine Lucy ...................... 1141
 Stand In Schoolhouse Door .......... 1143
 B. Auburn Polytechnic Institute ......... 1144
 Harold Franklin Admission .......... 1144
 C. Alabama State Teacher's College ..... 1145
 D. Alabama A&M College ............... 1148
 E. University of South Alabama ........ 1151
 F. Alabama College ................... 1151
 G. Florence, Livingston, Jacksonville and
 Troy State Teachers Colleges ........ 1151
 H. Actions of the State Board of Education 1152

 II. Development In The Period 1965-75 ...... 1153
 A. *Lee v. Macon County*, 267 F.2d 474
 (M.D. Ala. 1967) .................... 1153
 B. University of Alabama at Huntsville .. 1154
 C. Auburn University in Montgomery ... 1154
 D. Athens State College ............... 1155
 E. Troy State University at Montgomery 1156
 F. Alabama Commission on Higher
 Education .......................... 1156

III. The Land Grant Issue ................... 1157
 A. Alabama's Reaction to the First
 Morrill Act ......................... 1157
 B. The Hatch Act in Alabama .......... 1158
 C. The Smith-Lever Act in Alabama ..... 1159
 D. Components of Land Grant School ... 1160

 IV. Vestiges of the Dual System of Higher
 Education ............................. 1161
 A. University of Alabama System ....... 1161
 1. University of Alabama (Tuscaloosa) 1161
 2. University of Alabama (Birmingham) 1161
 3. University of Alabama (Huntsville) 1161
 B. Auburn University ................... 1164
 1. Main Campus .................... 1164
 2. Auburn University at Montgomery 1165
 C. Alabama State University ............ 1165
 D. Alabama A&M University ............ 1166
 E. University of South Alabama ........ 1167
 F. University of Montevallo ............ 1167
 G. University of North Alabama ........ 1167
 H. Jacksonville State and Livingston
 Universities ......................... 1168
 I. Troy State University ............... 1168
 J. Athens State ....................... 1169
 K. State Board of Education ............ 1169
 L. Other Indicia of Vestiges ............ 1170

 V. Special Defenses ........................ 1170
 A. Asserted Lack of a System of
 Higher Education .................... 1171
 B. Effect of *ASTA* case ............... 1171
 C. Asserted Lack of Standing and
 Failure to Exhaust .................. 1172

Conclusion .................................. 1173

MEMORANDUM OF OPINION

CLEMON, District Judge.

*Introduction*

The merits of this case involve two issues: whether the State of Alabama operated a racially dual system of higher education, and, if so, whether the vestiges of the dual system have now been eliminated. In 1983, the United States initiated this action under 42 U.S.C. § 2000d, d–1, ("Title VI") and the Fourteenth Amendment to the United States Constitution against the State of Alabama, its publicly supported institutions of higher learning and related agencies and officials. Two defendants, Alabama A & M University ("A & M") and Alabama State University ("ASU"), were granted leave to realign themselves as plaintiffs.

Since the issues in *Knight v. James*, 514 F.Supp. 567 (M.D.Ala.1981), are subsumed in this case, the certified class in *Knight* was permitted to intervene herein and to assert its claims under Title VI and 42 U.S.C. § 1983.

After protracted, voluminous and often unnecessary discovery, the trial of the case commenced in, and consumed the month of July, 1985.

 Based on the evidence adduced at trial, and for the reasons which follow, the court concludes that the State of Alabama has indeed operated a dual system of higher education; that in certain respects, the dual system yet exists; and that in other respects, the "root and branches" of the dual system have not been eliminated.

## I.

### The Historical Development of the Dual System of Higher Education

As of May 17, 1954—the date of *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954)—the system of higher education in Alabama consisted of (1) the University of Alabama, (2) Auburn Polytechnic Institute, (3) Alabama State Teachers College, (4) Alabama A & M College, (5) Florence State Teachers College, (6) Jacksonville State Teachers College, (7) Livingston State Teachers College, (8) Troy State Teachers College and (9) Alabama College. By July 2, 1965—the effective date of Title VI—the University of South Alabama had been added to the system. The historical development of each of these institutions shall be discussed in turn.

### University of Alabama

The University of Alabama is the flagship institution of higher learning in the State of Alabama.

In the 1819 statute granting statehood to the Alabama Territory, an entire township was reserved and appropriated to the state legislature "for the use of a seminary of learning." The education article of the Alabama Constitution of 1819 provided that there

> shall be and remain a fund for the exclusive support of a State University, for the promotion of the arts, literature, and the sciences; and it shall be the duty of the General Assembly, as early as may be, to provide effectual means for the improvement and permanent security of the funds and endowments of such institution.

A year later, the legislature enacted a statute providing "That a Seminary of Learning be and the same is hereby established, to be denominated The University of the State of Alabama." The University was formally organized in Tuscaloosa in 1831. For the next 129 years, no other state-supported institution of higher learning carried the word "university" in its title.[1] Until the Reconstruction period of Alabama history, the University of Alabama was the only state-supported institution of higher learning in the state.

From its beginnings until 1956, the University of Alabama ("the University") did not admit black students, pursuant to the ironclad custom and policy of the State of

---

1. The short-lived exception, Alabama Colored Peoples University, is discussed at p. 1147.

Alabama requiring segregation of the races in all spheres of life. To be sure, the constitutional article and statute creating the University never referred to segregation; but the University board of trustees, consisting, among others, of the governor and state superintendent of education, was evermindful of and obedient to that provision of the 1901 Constitution which recites: "separate schools shall be provided for white and colored children, and no child of either race shall be permitted to attend a school of the other race".

In September, 1952, two black graduates of a private black college, Autherine Lucy and Polly Ann Myers, applied for admission to pursue graduate study at the University. The board of trustees considered the applications on June 1, 1953; and it deferred action on the matter, ostensibly pending a decision by the Supreme Court in *Brown.* The board communicated its action to Arthur Shores, counsel for the applicants, along with the suggestion "that his clients could find courses in subjects desired by them at Tuskegee Institute and the Alabama State College at Montgomery." *Brown* was decided on May 17, 1954; and a year later, the University had not acted on the application.

After a brief evidentiary hearing in the lawsuit, *Lucy v. Adams,* 134 F.Supp. 235 (N.D.Ala.1955), Judge Grooms of this Court found that although there was no written policy or rule excluding blacks from the University, there was a tacit policy to that effect; and he enjoined university officials from denying Lucy, Myers or other similarly situated blacks "the right to enroll in the University of Alabama and pursue courses of study, solely on account of their race or color." The injunction was entered on July 1, 1955. The University appealed the case to the Court of Appeals and sought review by the Supreme Court; and on October 12, 1955, the United States Supreme Court denied review. *Lucy v. Adams,* 134 F.Supp. 235 (N.D.Ala.1955); *aff'd* 228 F.2d 619 (5th Cir.1955); *cert. denied,* 351 U.S. 931, 76 S.Ct. 790, 100 L.Ed. 1460 (1955).

The University denied admission to Lucy and Myers in the fall semester of 1955, on the ground that their applications were tardy. Finally, on December 30, 1955, Judge Grooms ordered the university officials to admit Lucy for the second semester, commencing February 3, 1956.

President Carmichael of the University summarized its sentiment:

[T]he court case which was decided on December 25, 1955, had been in litigation for three and a half years.... During that period the Board of Trustees sought through all legal means to maintain the historic tradition of segregation which they conscientiously believed to be in the best interests of all concerned. * * * Finally, when the last legal battle was decided adversely the trustees were faced with two alternatives, yielding to the court's decree or defying the law. * * [The lawyer-members of the Board of Trustees] as well as other members felt they had no choice but to comply with the court's decree. Accordingly, the Board voted to permit one of the litigants to enroll as a student in the University.

Autherine Lucy did indeed enroll at the University. Despite the denial of dormitory space and dining hall privileges to her by the board of trustees, she attended the first three days of classes. On the third day, February 6, 1956, a mob assembled and attacked her. She was hit with an egg; but due to the intervention of campus patrolmen, she escaped serious injury. That night, the board of trustees met and voted to exclude Lucy from attending classes until further notice. This action was defended as a safety precaution under the police power of the university.

By February 29, the trustees had not lifted their order of exclusion; and following a show cause hearing that day, Judge Grooms ordered that "the order of suspension or exclusion" be terminated by March 5, 1956. He nonetheless found that the university trustees and officials had neither been derelict in their duty nor defiant of the earlier injunction, but that their action

"... was taken in a good faith attempt to so protect the plaintiff and others." [2]

On the same day as Judge Grooms issued his order, the Board of Trustees met and unanimously adopted a resolution permanently expelling Autherine Lucy because of statements in her pleadings in which she expressed her belief that university officials had suspended her because of her color, and that they had conspired with others to violate the Court's order requiring her admission. Judge Grooms held that the Board of Trustees had properly expelled Autherine Lucy.

The University thus reverted to its all-white status; and remained so for another seven years.

In early 1963, three black students, Vivian J. Malone, Sandy English, and Jimmy A. Hood applied for admission to the University's main campus; two others, Marvin P. Carroll and Dave M. McGlathery, applied for admission to the University's Huntsville Extension Center. Their applications were not timely processed. On May 16, 1963, this Court ordered the trustees to process the applications and to admit the applicants if they were qualified. The Board minutes reflect that

The Board was faced with a choice between the admission of some of the applicants or the outright disobediance of the order of the Federal Court with consequent prison sentences and other severe penalties for the Dean of Admissions and any successor appointed for him, and everyone else officially connected with the University, which punishment would not prevent such admission. It has therefore directed the Dean of Admissions to notify two negro applicants who have been found qualified of their admission to the University, one at the Huntsville Center and one at Tuscaloosa for the sessions which begin June 10, 1963.

The meeting at which this action was taken was called by Governor George C. Wallace and held at his office at the State Capitol in Montgomery. The Governor "wished his vote recorded against admission because of his position as the constitutional executive office [sic] of the State of Alabama responsible for the peace and tranquility of the State." United States Exhibit ("USX") 9c.

Thereafter, in an effort to prevent the federal court-ordered desegregation of the University,[3] Governor Wallace publicly an-

---

**2.** The board member who testified in support of the indefinite suspension was of the opinion that Autherine Lucy "and the people who were sponsoring her and who were seeking to have her go to the University of Alabama" were deliberately trying to cause trouble and incite riot. Thurgood Marshall, co-counsel for Lucy, pressed the point:

Q Mr. Caddell, what was done by Autherine Lucy or anybody connected with [her] on Monday, February 6 that was unlawful?

A Well, Autherine Lucy came there in a Cadillac automobile; she had chauffers with her; she walked about on the campus in such a way as to I suppose, be obnoxious and objectionable and disagreeable.

A & M Exhibit ("AMX"), Transcript of 2/29/56 Hearing, p. 179.

**3.** It has been contended that the Governor was not motivated by a desire to prevent desegregation; rather that he was simply seeking to raise a grave constitutional issue concerning the usurpation of state powers by the federal government. A letter written by the Governor three months after the event lays to rest this attempted revision of history. In that letter, the Governor says, *inter alia,*

As we read the statistics of our Courts, Public Health Departments, we find that a vast majority of the crime committed in this area has been committed by members of the Negro race.... Their health records record the fact that a vast percentage of people who are infected with venereal diseases are people of the Negro race. Statistics from the Health Department also reveal the fact that an exceedingly high percentage of illegitimate children in this state and surrounding states are of the Negro race. We find that the Negroes are not aggresive in the respect of making progress and their own ability to live among themselves. * * * It is our firm belief that when God in Heaven made the Negro black, he meant for him to stay that way. Likewise when he made the white race white, He meant for them to be a pure race. *It is our further belief that when the two races mix and mingle in schools, from the first grade through college, this mixing will result in the races mixing socially,* which fact will bring about intermarriages of the races, and eventually our race will be deteriated [sic] to that of the mongrel complexity. * * * ... if we can manage to keep our races from mixing, we shall always have pure races.

nounced that he would "stand in the schoolhouse door" when the black students presented themselves for admission.

On June 10, 1963, United States President John F. Kennedy sent the following telegram to Governor Wallace:

I am gratified by .the dedication to law and order expressed in your telegram informing me of your use of National Guardsmen at the University of Alabama. The only announced threat to orderly compliance with the law, however, is your plan to bar physically the admission of Negro students in defiance of the order of the Alabama federal district court and in violation of accepted standards of public conduct. State, city, and university officials have reported that, if you were to stay away from the campus, thus fulfilling your legal duty, there is little danger of any disorder being incited which the local town and campus authorities could not adequately handle. This would make unnecessary the outside intervention of any troops, either state or federal. I therefore urgently ask you to consider the consequences to your state and its fine university if you persist in setting an example of defiant conduct, and urge you instead to leave those matters in the courts of law where they belong.

AMX 14B.

The Alabama National Guard was federalized by the President shortly thereafter. On the following day, when Vivian Malone and Jimmy Hood (escorted by United States Marshals) approached the Administration Building, they were met by Governor Wallace at the entrance. He was allowed to read a short statement; and the federalized Commander of the Alabama National Guard then asked the Governor to step aside. The Governor accommodated the request.

In the words of Governor Wallace: "At 3:33 P.M. (cst) June 11, 1963, through the use of Federal Troops [President Kennedy] assumed full responsibility for the presence of Negro students..." AMX 14E. Three

days later, the President wired the Governor:

Regretfully, it was necessary to send troops to Tuscaloosa to enforce the courts orders. Maintenance of law and order, however, remains your legal and moral responsibility. I know you were opposed to the admission of the Negro students, but that is now passed. They are attending the university, and I would like to withdraw the troops as soon as possible.

AMX 14A.

Governor Wallace's June 17, 1963 response to the President reads:

I can and will guarantee that there will be no sustained violence in Alabama, but with our limited resources, physical and financial, Alabama cannot insure absolutely the personal safety of individual students. Surely you realize that a continuous cause of the tension in Alabama is the presence of the three Negro students on the campuses of the University, and I suggest that you immediately secure their withdrawal.

\* \* \* \* \* \*

You have created the situation existing in Tuscaloosa, Alabama. You must assume the responsibility. You cannot usurp the powers reserved to the State of Alabama and then place the burdens thereby created on my shoulders.

AMX 14H.

The evidence does not disclose the date on which the federal troops were removed.

On June 12, 1963, Governor Wallace reminded President Rose of the University that on the preceding afternoon, "President Kennedy with the use of armed Federal troops assumed control of the campus of the University of Alabama which includes the campus at Huntsville." In view of this "illegal and unwarranted military occupation," the Governor decided that he would not "stand in the door" of the Huntsville campus when Dave McGlathery presented himself. He promised that "we will contin-

Letter from Governor Wallace to Art Wallace, dated 9/13/63. AMX 14G. (emphasis added).

ue relentlessly our fight against forced integration of the University of Alabama." AMX 14B.

The record evidence does not pinpoint the date on which the fight ended; but by 1965, there were 31 black students enrolled at the University of Alabama. Two years later, that number had increased to 119 blacks out of a total student population of 12,251.

### Auburn Polytechnic Institute

Auburn University's roots extend to the East Alabama Male College, a denominational school which was started in 1859. Closed during the Civil War, the school reopened in 1866. In 1872, the Methodist Church offered the school to the state; the state legislature accepted it and named the school, "the Agricultural and Mechanical College of Alabama." It was designated as the land grant college of Alabama under the terms of the 1862 Morrill Act. The 1875 and 1901 Constitutions of Alabama expressly recognized the status of the school. Women were admitted in 1892; and in 1899, the name was changed to the Auburn Polytechnic Institute. In 1960, the name was again changed, this time to Auburn University ("Auburn").

From its inception until 1963, Auburn did not admit black students.[4]

In 1962, Harold A. Franklin, a black graduate of Alabama State University, applied for admission to the graduate school of Auburn University. He was denied admission by the Dean of Auburn's graduate school on the stated ground that Franklin's undergraduate degree was awarded by an unaccredited institution. In *Franklin v. Parker*, 223 F.Supp. 724 (M.D.Ala.1963), Judge Frank Johnson ordered Auburn to admit Franklin and

> ... other qualified Negro applicants to the Auburn University Graduate School, without regard to any statute, policy, practice, custom and usage which may be contrary to the due process and equal

protection clauses of the Fourteenth Amendment to the Constitution of the United States.

*Id.* at 728.

Governor Wallace, as chairman of the Auburn Board of Trustees, then intervened and, through his effort, Auburn University refused to grant dormitory space to Franklin, although the space admittedly was available. AMX 12A. Judge Johnson ordered Auburn to provide the dormitory space forthwith. Franklin was accordingly admitted to Auburn University on January 2, 1964.

Resistance to the desegregation at Auburn in the early sixties was spearheaded by the chairman of its board of trustees, the Governor. Dr. Ralph Draughon, President of Auburn, did not always agree with the Governor's tactics. When Draughon wrote to the Governor protesting the action of State Troopers in barring federal agents from the campus during the Franklin admission, the Governor responded:

> Of course, you and I were never in agreement relative to the proposition of integration at Auburn. As you will remember, it was your suggestion that Auburn voluntarily admit a Negro student. This never did and never will receive my approval.
>
> I will say that it is difficult for me to understand the lack of cooperation at Auburn University in that through my efforts the University now has its largest appropriation in the history of the State. My efforts in behalf of Auburn University have apparently had no effect on your attitude.

AMX 12B, p. 3.

The Board of Trustees named a new president in the following year. The new president was the first to sign a statement endorsing the Governor's opposition to the 1966 HEW Guidelines for school desegre-

---

4. Because of this policy and custom which had the force of law, the legislature designated the Huntsville Normal School as the land-grant college for blacks in 1891 so that Auburn might continue receiving Morrill Act funds.

gation;[5] and when the three-judge court handed down its decision in *Lee v. Macon County Board of Education,* 267 F.Supp. 458 (M.D.Ala.1967), the president of Auburn was again the first to sign a petition urging the Governor and the State Attorney General to request a stay of the judgment pending an appeal of the decision to the United States Supreme Court. AMX 18, 20.

Auburn was not a party in *Lee v. Macon,* and it had no legally cognizable interest in the case. Of course, these public positions of Auburn's president on matters of school desegregation did nothing to dispel the image of Auburn as an institution more concerned with preserving segregation than opening its doors to black students.

By 1970–71, there were only 71 (.6%) blacks among the 1,484 undergraduates enrolled at Auburn; there were 10 black graduate students out of a total of 662.

*Alabama State Teachers College* [6]

The institution now known as Alabama State University had its origins in Marion, Alabama. In 1867, Jabez L.M. Curry,[7] ex-confederate officer and former president of Howard College of Marion, organized a mass meeting of blacks in Selma, Alabama, for the purpose of setting up a school for blacks. As a result of this meeting, a black school was set up at Marion in that year, with the assistance and financial support of the Conservative Party. In July of the following year, the Alabama Board of Education made an appropriation to the Marion Normal School from the black share of the common school fund.

In November, 1871, Peyton Finley, the black member of the State Board of Education, introduced two bills to the board. The bills provided for the creation of four schools for black teachers, and an equal number for white teachers. The bills were passed a month later; and $4,750 was divided among the black normal schools at Montgomery, Sparta, Marion and Huntsville.[8]

In 1872, the normal school at Montgomery was not funded; but the appropriation for the school at Marion was made permanent.

Peyton Finley was "a strenuous advocate of the establishment of a University for Negroes in the State, to do for the Negro what the University of Alabama purported to do for white persons." *Bond,* 107. At the first session of the Board of Education which he attended as a member, he presented a resolution urging the creation of a black university and petitioning Congress "for a grant of public lands in aid of such a University." Nothing ever came of this resolution. Later in the year (1871), Peyton introduced a similar bill; but a substitute amendment was adopted which doubled the appropriation for the school at Marion, in lieu of making it a university. Finally, in the latter part of 1873, a bill to establish a "State Normal School and University" was passed by the State Board of Education.[9] Lincoln Normal School, which had been operated by the American Missionary Society since 1866, was donated to the State for use as the campus of the new

---

5. The President of the University of Alabama apparently refused to endorse the Governor's position.

6. The historical facts concerning Alabama State and A & M are based on the evidence and Horace Mann Bond's *Negro Education in Alabama: A Study In Cotton and Steel.* New York, Antheneum, 1969; Robert G. Sherer's *Subordination and Liberation: Development of Conflicting Theories of Black Education in 19th Century Alabama.* University of Alabama Press, 1977. These books are included in the bibliography of Auburn's land grant expert, Dr. William Warren Rogers; and pursuant to A & M's Request For Judicial Notice, they are so noticed.

7. Curry later became the General Agent of the Peabody Fund and administration head of the Slater Fund, which donated millions of dollars to black and white schools in Alabama during the period 1868–1914.

8. $4,500 was to be divided among the white schools.

9. During this period of Alabama history, the State Board of Education was empowered to enact laws dealing with education.

university; and a board of directors, consisting of the state superintendent of education and five black citizens, was the governing body of the university.

In 1874, there were one hundred black students enrolled at "normal University." Its appropriation of $2,000 (compared with the $2,400 yearly income of the University of Alabama) was doubled the following year. The school had three white faculty members; and the newly elected Democratic school superintendent wrote:

> The normal school at Marion is designed to become a University for the colored race in the State; and it is not doubted that its facilities for furnishing the higher education to this race will be amplified as the demand therefor becomes apparent.

*Bond,* 110.

In 1878, William Burns Paterson was elected president of the State Normal School and University at Marion. Of Scottish birth, he had come to the United States as an immigrant eleven years earlier. He worked at odd jobs from New York to Hale County, Alabama, in which he settled in 1870. Over the opposition of local whites to a white person teaching black people, Paterson set up the Tullibody Academy in Greensboro for the education of black freedmen. Tullibody Academy was so well-respected seven years later that Burns was chosen to head the State Normal School and University, also known as Lincoln Normal University.

The first curriculum at the Marion school was classical only. Between 1880 and 1885, the school developed a carpentry course for the male students. By 1885, Lincoln Normal University consisted of a main building, a small dormitory, and the president's residence. There were 10 faculty members—the only black being the head of the Industrial Department. Its enrollment in that year slightly exceeded 300; it had 17 in the graduating class.

In each of the next two years, pivotal events charted the course of the school. In December 1886, a riot ensued after several white cadets at Howard College (also located in Marion) shoved a Lincoln student off the sidewalk as they walked abreast. In apparent retaliation, the main building at Lincoln School was destroyed by arson; and the Marion city fathers demanded of the legislature that the school be either closed or moved to another city.

The legislature responded by appointing a committee, chaired by the Governor, to determine an appropriate place for the relocation of the school. Montgomery, Selma and Birmingham were considered; but the advocacy of the *Montgomery Advertiser* resulted in the decision to relocate the school in Montgomery in 1887.[10]

On February 27, 1887, the legislature enacted a bill "to establish the Alabama University of Colored People, and to provide for its support and maintenance." The Alabama Supreme Court described the legislation:

> It establishes a University, with the implied privileges and powers appertaining to such institutions of higher learning, and as contradistinguished from high schools, and even colleges. It is not subject to the supervision of the Superintendent of Education, in whom the constitution vests the supervision of the public schools.

> It provides for the appointment of trustees, who are empowered to elect a faculty, and such officers and agents as they deem necessary; to discharge any member of the faculty, or officer or agent, at their pleasure; to prescribe their duties, and fix their compensation; and generally, to govern and control the faculty and the University, "so that the students therein may be taught in the best manner possible the things they are to live by, preferring always the English language and the industries, to an education for culture only."

---

**10.** Not without significance, Booker T. Washington of Tuskegee Institute (which had been founded with a $2,000 state appropriation only six years earlier and was only forty miles from Montgomery) secretly lobbied against relocating the school in Montgomery.

*Elsberry v. State,* 83 Ala. 614, 619, 3 So. 804 (1887).

Upon the creation of Alabama Colored Peoples University at Montgomery, President Paterson secured the assistance of local black leaders; and on October 3, 1887, the university opened in the basement of Beulah Baptist Church with ten teachers and about 400 students.

A few months after the opening of the University, in February, 1888, the Alabama Supreme Court held in *Elsberry* that the act creating the university was unconstitutional, on the ground that the $7,500 annual appropriation for the university was to be taken from the school funds earmarked for the colored race. The Court reasoned that the school funds apportioned between the races must be appropriated for public schools; and that the Alabama Colored Peoples University was not a public school.[11]

Alabama Colored Peoples University therefore received no state funding for the 1888–89 school year.

On February 23, 1889, the Legislature reacted to the *Elsberry* decision by creating a State Normal School for Colored Students to be located in Montgomery with an annual appropriation from the colored school fund of $7,500. The State Board of Education was assigned the responsibility of operating the school. Three months later, the black community in Montgomery donated $3,300 in cash and 6½ acres of land to the normal school. The school moved into its new quarters shortly after the beginning of the 1889–90 school term.

From the turn of the century until the forties, the State Normal School for colored students fared better at the hands of the State Board of Education and the State Legislature than the Agricultural and Mechanical College for Negroes.

By 1902, 56% of the 229 graduates of the State Normal School for blacks were teachers; only 25% of the 736 A & M graduates were teachers.

Between 1920 and 1929, all of the normal schools in Alabama operated under a two-year curriculum. In 1929, the normal schools became teachers' colleges with four-year courses of study; from that year until 1969, the black teachers college in Montgomery was known as "Alabama State Teachers College."

In January, 1949, Governor James E. Folsom appointed a "Committee on Higher Education for Negroes in Alabama." The Committee consisted of 35 distinguished citizens of Alabama, including the presidents of the black state-supported institutions, the State Superintendent of Education, and a Richard T. Rives of Montgomery, who was subsequently appointed to the United States Court of Appeals for the Fifth Circuit. In its final report, the Committee recommended that Alabama State College for Negroes "be developed as the State's University for Negroes," and that a law school for Negroes be established there. It further recommended that Alabama State be appropriated $695,000 annually (including funds for the law school and expansion of undergraduate and graduate curricula); and that $2,465,000 be appropriated to the college for capital outlay. These recommendations were never acted on by the legislature.

By the fifties, Alabama State College was offering the master's degree in education. Its undergraduate degree fields included secretarial science and music education. The curriculum had been broadened "to give preparatory college training for further study in medicine, law, theology, social work, library science, dentistry and nursing."

Alabama State was not accredited by the regional accrediting agency, the Southern Association of Secondary Schools and Colleges, until 1966; and its name was changed to Alabama State University in 1969. It remained under the control of the

---

**11.** The opinion was written by Justice Clopton, a former representative in the Confederate Assembly and former president of the East Alabama Male Institute (the predecessor to Auburn Polytechnic Institute).

State Board of Education until 1975. Pursuant to the policy of its governing board, Alabama State could not admit white students until 1967; its first white student enrolled in the following year.

### Alabama A & M College

William Hooper Councill was the single most important force in the origin and development of what was later to become Alabama A & M University. He was born into slavery; and by the time of emancipation, his family lived in Jackson County, Alabama. Largely self-taught, he moved to Huntsville in 1869 and opened a rural school for blacks about four miles west of Huntsville. In Huntsville, Councill became active in Reconstruction politics and was elected to the position of reading clerk in the Alabama Legislature, where he served from 1872–74. He was admitted to practice law in Alabama in 1883.

Two years after the State Board of Education enacted Peyton Finley's bill creating segregated normal schools, the Huntsville Normal School was established, with an annual appropriation of $1,000. In 1875, the school formally opened with Councill as its principal, and 61 students. For the next seven years, the classes were conducted in rented houses in Huntsville.

By 1882, the enrollment at the normal school had grown to 200; and the annual state appropriation had grown to $2,000. A $3,000 parcel of property had been purchased, and the two-story building on it had been remodeled for use as a school building.

With $1,000 donated to the school by the Slater Fund, Councill inauguated an industrial department of the normal school by 1885. Fifty-five students were receiving industrial training in carpentry, painting, printing, sewing, and horticulture. In the same year, the Legislature doubled the appropriation to the school;[12] and its name

was formally changed to "Huntsville State Colored Normal and Industrial School."

Councill and the students of the Huntsville Normal and Industrial School were involved in separate racial incidents in 1887. While riding on a first-class railroad car from Tennessee to Atlanta in the summer of 1887, Councill was roughly evicted from the first class section. He filed a complaint with the newly created Interstate Commerce Commission, which ruled that Councill had not been treated equally and directed the railroad to provide equal service for blacks in the future. This incident caused no real problem with whites in Alabama.

During the same summer, however, several of the students of Huntsville Normal innocently entered the first-class railcar on the train from Huntsville to Decatur. The porter and conductor strongly protested; and, upon learning of the incident, the resulting hue and cry from local whites was so great that Councill tendered his resignation as principal. The resignation was promptly accepted by the all-white commissioners of the school, and they appointed a new principal. There followed such a groundswell of moral and financial support for Councill from within and outside the state that the commissioners were persuaded to reinstate Councill as principal of the school in 1888. He remained in this position until his death in 1909.

Congress enacted the Second Morrill Act in 1890, after it became clear that the Southern states had denied black citizens the right to attend the First Morrill Act land grant colleges. The Alabama Legislature set up a commission to determine which of Alabama's three black state-supported normal schools[13] would be designated as the black land grant school. Tuskegee Institute had the decided advantages: it had more buildings, more students, and the support of both of Alabama's sena-

---

12. The state appropriation was not increased for the next third of a century.

13. Actually, by that time Tuskegee Institute, which had started as a normal school in 1881

with a $2,000 state appropriation, depended on Northern philanthropists for virtually all of its income.

tors.[14] These considerations were not enough to overcome the legislature's reaction to a speech of Booker T. Washington delivered in Montgomery ten days before the decision was to be made. In that speech, Washington attacked as unfair to blacks the School Fund Apportionment Law enacted by the legislature earlier that year; and, to the further consternation of the legislature, he challenged the practice of providing separate railroad cars for blacks. Councill, with the assistance of the ex-Confederate officers on his board, then successfully urged the Legislature not to grant the funds to a black school headed by a white man (i.e., Alabama State Normal School for colored students at Montgomery).

Washington's speech having rendered Tuskegee ineligible,[15] and President Paterson's color having disqualified Alabama State Normal School in Montgomery on February 13, 1891, the Huntsville State Normal School was designated by the legislature as the land grant school for blacks in Alabama.

After it had been designated as the black land grant school in Alabama, the commissioners of the Huntsville Normal School sold the campus in the City of Huntsville and moved the school to a new location four miles north of the city. This new site, at Normal, Alabama, had once been a plantation, race course, and an inn. It had several buildings which were used by the new school as faculty homes, offices, and shops. Palmer Hall, Seay Hall, a barn and a dairy were all constructed between March and August of 1891; and on September 1, the school opened at the new location.

Between 1893 and 1896, Councill became convinced that it would be impossible for blacks to attain full equality in the United States; and in his writings and speeches, he urged a gradual migration of blacks to Africa. This philosophy caused his school to lose both black and white support.

Five years after having designated the Huntsville Normal School as the state land grant school for blacks, the Legislature decided to establish two "agricultural experiment stations for the colored race and to make appropriations therefor." One of these was established at the Alabama State Normal School for colored students at Montgomery, to be operated by "its present board of trustees." The other was established at Tuskegee Normal and Industrial Institute; to be operated by a "board of control" consisting of the state commissioner of agriculture, the president of Auburn Polytechnic Institute, and the members of the Board of Trustees of Tuskegee Institute "who reside in the town of Tuskegee, Alabama." The 1896 decision to exclude the Huntsville Normal School from state-supported agricultural research was the beginning of nearly three-quarters of a century of rather blatant discrimination by the legislature and the State Board of Education against the black land grant school.[16]

In the same year, the Legislature changed the name of the school to the "Agricultural and Mechanical College for Negroes," and gave it the power to confer degrees.

From its inception until the summer of 1920, the governing board of A & M was a three-member board of commissioners, with the governor and the state superintendent of education as ex-officio members of the board. The 1894–95 catalog of the institution reflects that

---

14. Senator Pugh introduced an amendment to the Act to permit the funds to go to schools which did not have "college" in their names; Senator Morgan publicly stated that the funds should go to Tuskegee, which has "... done more for the youthful colored population in that State than can be claimed by almost any other State in the South."

15. Washington apparently learned his lesson well. Five years later, he delivered his famous Atlanta Exposition speech, in which he urged blacks to forego social and political equality with whites and to develop industrial skills.

16. Ironically, as Councill's (and thus A & M's) stock fell with the legislature, Booker T. Washington's (and therefore Tuskegee Institute's) stock rose.

[t]he three Trustees or Commissioners representing the State of Alabama are all men of superior character, education, and wealth. All of them were slave-holders, and commissioned officers in the Confederate army.

State of Alabama Exhibit ("SX") 139, p. 17.

In 1920, the school was placed under the authority of the State Board of Education, where it remained until 1975.

Upon the death of Councill in 1909, his son-in-law, Walter S. Buchanan, was appointed to succeed him.

The Smith Lever Act, providing funds for agricultural extension work, was enacted by Congress on May 8, 1914. At that time, A & M's School of Agriculture was already engaged in extension work, and had been so involved since the 1890's. The 1913 catalog described this work:

> The agricultural extension work is intended to reach and help the large mass of farm workers among our people who cannot attend school. The following lines of extension work have been conducted during the past year and arrangements are being made to enlarge the work another year:—
>
> 1. Farmers' Institute for the adult farmers.
> 2. Boy's Corn clubs for the boys from nine to eighteen years of age.
> 3. Girls' Tomato clubs for girls from nine to eighteen years of age.
> 4. School Farm clubs for the purpose of extending the school term and improving the condition of the school.

AMX 38, pp. 23–24.

In 1905–06, there were over 160 students enrolled in the four year college and normal departments of A & M. In 1913–14, there were only 36 students enrolled in the "Teachers' College" of A & M. There were 27 such students in 1914–15. During the same period, over 100 of the A & M students were enrolled in agriculture courses.

Nonetheless, A & M was not designated a co-recipient of Smith Lever funds. After losing in these efforts, A & M's financial condition progressively deteriorated. Its annual $4,000 state appropriation—lower than of any other state institution [17]—was not increased by the legislature until the school was placed under the control of the State Board of Education.

In fact, in 1918, the legislature appropriated only $1,000 to A & M.

A & M did not fare well under the state board of education. In the same year as it came under board of education control, it was reduced to a two-year curriculum—with emphasis on agricultural and industrial education. It did not resume its status as a four year school until 1939; while all the "Class A" schools and Alabama State reverted to four year teacher's colleges ten years earlier.

When the legislature established a graduate school in agriculture for blacks in 1945, it was placed at Tuskegee, rather than A & M. A total of $300,000 was appropriated for the establishment of this school; and a line-item appropriation of $100,000 was authorized.

Four years later, the legislature authorized the state board to provide courses for blacks in areas such as chemistry, engineering, vocational agriculture, and "such other educational services which in the opinion of the Board of Education is in great enough demand to justify a contract." SX 162. Instead of developing these courses at A & M, the Board of Education contracted with Tuskegee Institute for these courses.

By 1943, there were 562 students at A & M. Fifty-four of these were in agriculture, 118 were enrolled in mechanic arts, and 231 were in home economics. Further,

> several classes were taught for out-of-school rural youth in farm machinery repair, blacksmithing, wood working, and

17. In 1916 and 1917, Alabama State's annual appropriation was $15,000. The white normal schools were appropriated $20,000.00 on the average in those years. The University of Montevallo received $54,427.68; and the University of Alabama received an annual $71,000 appropriation. Auburn's $87,280 was the highest state appropriation in those years.

general farm production and conservation.

A Farmers' Conference was held in February 1943, bringing to the campus more than 300 farm men and women. * * [T]he extension division served 179 off-campus workers.

SX 168.

In 1948, A & M's name was changed to "Alabama Agricultural and Mechanical College." In 1969, the board of education gave it its present name. It was accreditated by the Southern Association of Secondary Schools and Colleges in 1963.

Until the 1967 injunction in *Lee v. Macon*, A & M did not admit white students.

### University of South Alabama

Beginning in 1942, the University of Alabama offered extension courses to whites in Mobile—the second largest city in the state. At that time, and until 1963, there was no other state-supported four-year institution serving whites in the Mobile area.[18] By 1963, the University's Mobile Center accommodated some 1,500 part time students.

The University of South Alabama ("USA") was created by the legislature in 1963. Upon its creation, the director of the University Mobile Center became its new president, and upon the request of the board of trustees of USA, the University Mobile Center ceased operations in 1964.

When USA commenced operations in 1964 and for the next three years, its doors were not open to blacks, pursuant to state custom and practice which had the force of law.

### Alabama College

The University of Montevallo had its origins in an 1893 legislative act which established "an industrial school for the education of white girls in Alabama." In 1895, Montevallo was chosen as the site for the new school. The name became "Alabama College" sometime thereafter. Men were

first admitted to the college in 1956, when the legislature designated Alabama College as the state's college of liberal arts.

In 1969, the Board of Trustees changed the name to the University of Montevallo.

As of 1965, the school was still operated for whites only, under the established custom and policy of the State.

### Florence, Jacksonville, Livingston and Troy State Teachers Colleges

Florence, Livingston, Jacksonville, and Troy State Teachers Colleges were the result of Peyton Finley's efforts to establish normal schools.

In December, 1871, the State Board of Education enacted a law establishing "a normal school at Florence, Alabama, for the education of white male teachers." The opening of the school was made possible by an 1873 deed to the state of the grounds and buildings of Florence Wesleyan University. The new normal school was appropriated "... at least five thousand dollars of the general educational fund of the State apportioned to the whites." In its 1873 amendment to the act establishing Florence Normal, the board indicated that the school would provide for the education of white female, as well as male teachers.

In 1883, the state legislature established a normal school for "white female teachers" at Livingston, Alabama, and another for white "male and female teachers" at Jacksonville, Alabama. Both schools were initially operated by a board of directors.

In 1887, the legislature "permanently established in the City of Troy, Pike County, ... a school for the education of white male and female teachers...." A board of directors for the "State Normal School at Troy" consisted of nine trustees and the state superintendent of education. The state board of education subsequently took control of the school, and operated it as one of the four "Class A Normal schools."

---

**18.** Alabama State College operated a Mobile Extension Center at which black high school grad-

uates could receive their first two years of college education.

By the turn of the century, each of these normal schools, as well as Alabama State Normal School for Negroes, had been placed under the control of the Board of Education. The four white normal schools were designated, "Class A Normal Schools." [19]

In 1920, the Board of Education reduced the curricula of the Class A Normal Schools to two-years. Nine years later, the four-year curriculum was restored at the schools, and they were named "teachers colleges."

Historically, these white teachers colleges received considerably larger state appropriations from the Board of Education than the black colleges. The presidents of the white teachers colleges were consistently paid higher salaries than the president of ASU. Under the 1927 School Code, for example, the white normal schools were each appropriated $40,000 annually; the "State Normal School for colored teachers located at Montgomery" was appropriated exactly one-half of that amount.

Florence State College did not admit black students until 1963, when Wendell W. Gunn was ordered admitted to the school by this Court. There is no credible evidence that any other black students were admitted to the school prior to 1967.

Livingston University admitted its first black student on January 5, 1966. Not a single black had been admitted to the two other schools prior to the 1967 order in *Lee v. Macon County Board of Education*, 267 F.Supp. 458 (M.D.Ala.1967).

The Board of Education had direct involvement in the day to day administration of the two black colleges under its control. In 1921, for example, the board limited the debt-incurring authority of the president of A & M to $50. As late as 1960, the Board of Education expelled black ASU students after they had participated in a sit-in. *Dixon v. Alabama State Board of Education*, 186 F.Supp. 945 (M.D.Ala.1960); *rev'd*, 294 F.2d 150 (5th Cir.1961). In discussing Alabama State's lack of accreditation in 1963, Judge Johnson wrote:

> Thus, if there was a 'weakness' or graduate program 'insufficiently supported' by faculty and library or a 'very confused situation in the general administration' of the college, it was the responsibility of the State of Alabama, acting through its State Board of Education, to correct these matters instead of allowing these deficiences to continue.

*Franklin v. Parker*, 223 F.Supp. 724 (M.D. Ala.1963).

The Southern Association of Secondary Schools and Colleges did not admit black colleges to membership prior to 1956. In that year, Alabama State College was given probationary accreditation for five years. In 1961, accreditation was denied to both Alabama State College and A & M. All of the "Class A" schools were fully accredited. *Id.*, at 725, 726.

The Board of Education and the State of Alabama took various actions which had the effect of stymying the growth and development of both Alabama A & M and Alabama State College. Instead of setting up a School of Veterinary Medicine for blacks at the black land-grant school (since Auburn's School of Veterinary Medicine was by statute "for whites"), Tuskegee Institute was chosen instead. Therefore the annual appropriation went to Tuskegee, rather than to A & M. For a number of years, the state superintendent of education contracted with Tuskegee Institute to provide to black students "courses in engineering, veterinary medicine, and graduate courses offered in home economics and vocational agriculture;" and under this contract alone Tuskegee received $300,000 annually during the fifties. Obviously, these courses should have been developed at Alabama A & M, and the funds should have gone to that school. Rather than setting up a nursing school at Alabama

---

**19.** The "Class B Normal Schools" were apparently white also; but they generally offered education below the collegiate level.

State College or A & M,[20] the state superintendent contracted with Tuskegee Institute to provide nursing education to blacks.

Until 1966, where black residents of Alabama desired to take a course or program offered by either the University of Alabama or Auburn, but unavailable at A & M, Alabama State College, or Tuskegee,[21] the state Board of Education funded the difference between the tuition and expenses at the University or Auburn and that of the college or university of their choice.

As of 1965, blacks had never been appointed to the governing boards of any of the institutions of higher learning in the state or to the State Board of Education. Faculties and staffs were rigidly segregated. Alabama State was operated as the black counterpart to the University of Alabama; A & M was the black counterpart to Auburn. The black institutions were unequal, in every objective sense, to the white institutions of higher learning.

The conclusion is inescapable that as of July 2, 1965, the State of Alabama continued to operate a racially separate and unequal system of higher education.

## II

*Development In The Period 1965–1975*

In the 1965–1975 decade, six developments within the system of higher education impacted on its ability to disestablish its racial duality. The three-judge court handed down its decision in *Lee v. Macon County;* the University of Alabama at Huntsville ("UAH"), Auburn University at Montgomery ("AUM") and Troy State University at Montgomery ("TSUM") were established; Athens College became a part of the state system of higher education; and the Alabama Commission on Higher Education ("ACHE") was established.

**20.** Presently, there are nursing schools at each of the successors to the "Class A" schools; neither Alabama State College nor A & M has one.

**21.** Tuskegee was considered only in those instances in which the superintendent had contracted with it for a particular course or program.

On March 27, 1967, the three-judge panel in *Lee v. Macon* found that

The State's trade schools, vocational schools and state colleges: continue to be operatEd on a segregated basis. The operation of these systems is the immediate responsibility of the State Board of Education.

\* \* \* \* \* \*

There is no necessity for setting out the facts in detail concerning the operation of these state colleges since the evidence conclusively establishes—the defendants do not controvert it—that these schools have been and continue to be operated as if *Brown v. Board of Education* were inapplicable in these areas.

\* \* \* \* \* \*

It is quite clear that the defendants have abrogated, and openly continue to abrogate, their affirmative duty to effectuate the principles of *Brown v. Board of Education, supra.* Although the facts as herein outlined speak eloquently for themselves, there is no more clear an indication of this than Superintendent Meadows' statement that he has done nothing to eliminate segregation in the public schools of Alabama.

267 F.Supp. at 474. The Court proceeded to order the Board of Education to admit blacks to the state colleges under its control, and to "... direct such ... state colleges to recruit, hire, and assign teachers so as to desegregate faculty and to accomplish some faculty desegregation in each such ... state college by September, 1967." 267 F.Supp. at 484.

Reaction was swift. Six years earlier, Governor Patterson had repeatedly urged the state legislature to remove the white colleges from the control of the board of education, so that desegregation efforts would be frustrated.[22] At the session of

**22.** Governor John Patterson made the following statement to a Joint Session of the Alabama Legislature on May 2, 1961:

I wish to again recommend the enactment of a law placing our State colleges—with the exception of the Negro colleges—under the control of separate boards of trustees if they

the legislature following *Lee v. Macon,* the legislature wasted no time in enacting Governor Patterson's proposal into law. Motivated by racial considerations, the white colleges thus received separate boards of trustees at the hands of the legislature, while Alabama State College and A & M remained under the control of the State Board of Education.

The University of Alabama started offering extension courses in the Huntsville area in the 1950's. The Army Ballistic Missile Agency was set up in Huntsville in 1956; and four years later, the Marshall Space Flight Center of the National Aeronautics and Space Administration ("NASA") was likewise established there. With the resulting influx of scientists, engineers, and other technicians in the Huntsville area, in the late fifties and early sixties, there was a demand for a graduate program in engineering and the sciences. A & M College was located in Huntsville, but it was never seriously considered as a source for these courses because it was a black school; and under the law and firmly established custom of the State of Alabama, white students could not attend it and white teachers could not teach there. The University's Huntsville Extension Center was the choice of the community, federal government officials and scientists; and as the community and federal government officials were well aware at the time, blacks could not attend the Extension Center.

As found earlier, Dave McGlathery became the first black to attend the Huntsville Extension Center in 1963. He was admitted only under a court order and the "military occupation" by federal troops of the "campus of the University of Alabama, which includes the campus at Huntsville," to enforce the order.

In 1963, UAH started offering degree programs at the master's level; and in the following year, undergraduate degree programs were offered. Doctoral programs in physics and engineering were first offered in 1971.

As of September, 1967, UAH offered programs in four divisions: engineering, general studies, natural sciences and mathematics, and graduate studies. The undergraduate degree programs consisted of: Bachelor of Arts in english, history, and mathematics; Bachelor of Science in physics and Bachelor of Science in engineering, with specializations in electronics, mechanics and systems. Master's degree graduate programs were offered as follows: Master of Science in physics; Master of Science in engineering. UAH offered no doctoral programs in 1967.

The UAH campus is in northwest Huntsville, adjacent to Research Park. Its 13 buildings were all constructed since 1960, and they contain modern equipment and exemplify modern functional design. The UAH main campus consists of 337 acres; it has two modern buildings for medical education and patient health care in a separate, ten-acre medical campus.

Both UAH and A & M are within the city limits of Huntsville.

Prior to 1967, the University of Alabama operated an Extension Center in Montgomery. The Extension Center offered three years of college work, but it did not offer degree programs. Alabama State College was the only four-year, degree-granting, state-supported institution of higher learning in the county. In 1966, the all-white Montgomery Chamber of Commerce reactivated its dormant Education Committee in an effort to establish a four-year state-sup-

---

are not already under such boards. I make this recommendation because I see the need for further decentralizing control of our colleges due to continued attacks by race agitators to integrate our schools. This decentralizing would make it more difficult for these agitators to attack more than one college at a time. I believe the Negro colleges should remain under the control of the State Board

of Education. I also recommend the enactment of a law placing the State trade schools under separate boards of trustees for the same reasons. The members of the Boards of Trustees should be appointed by the Governor for fixed and staggered terms, and the Governor should serve as ex-officio chairman of the boards in every case.

ported institution for whites in the Montgomery area.

The Chamber of Commerce first approached the University of Alabama; it declined the invitation. Auburn University was next approached, and it agreed to undertake the project. Governor Wallace and the local white elected officials all gave their wholehearted support for the project.

Auburn made no independent study or investigation concerning the need or feasibility of a branch in Montgomery; it basically took the position that while it would do nothing to promote or secure a branch in Montgomery, it would operate a branch there if the legislature made an appropriation for such a branch and assigned it to Auburn.

The Montgomery Chamber of Commerce never considered the utilization or expansion of Alabama State, although the school had existing programs in liberal arts, business and teaching education, and continuing education for adults. The reason is simple: at the time, the Governor and the legislature would not have supported a racially mixed institution of higher learning in Montgomery.

At the very time that the Chamber negotiations with Auburn were being had, the Governor and the legislature were expressing their fury over the decision in *Lee v. Macon*, 267 F.Supp. 458 (M.D.Ala.1967), which had, among other things, required the desegregation of the senior colleges under the control of the State Board of Education. In an effort to thwart the decision, the legislature removed the white colleges from the control of the state board and placed them under separate boards of trustees.

On the same day that Governor Wallace signed the bills creating separate boards of trustees for the white teacher colleges, he signed a bill providing tuition grants to students who chose not to attend desegregated public schools; and he also signed the bill creating AUM and appropriating $5 million for its construction and operation.

Given the mood of the 1967 session of the legislature, it is apparent that it would not have considered the expansion of a black college so that it could serve white students.

AUM is located roughly five miles from ASU in Montgomery. According to the Auburn catalog, AUM "... has developed rapidly, especially since moving to a new 500 acre campus ... in 1971."

Athens State College boasts that it "is both the oldest and the youngest institution of higher education in Alabama's state educational system." It was founded in 1822; and for more than a century, it was operated as a private college by the Methodist Church. In 1974, in the face of an insurmountable financial crisis, the United Methodist Church offered the college to the State of Alabama; and in 1975, over the objection of ACHE, the school was accepted by the State Board of Education subject to the appropriation of operating funds by the legislature.

The legislature authorized Athens State to function as a senior college. It accepts transfers from the junior college community and technical colleges of the State, as well as transfers from the traditional four-year colleges and universities.

In 1981, the legislature placed Athens State and John C. Calhoun State Community College under a single administration. In the words of the State Superintendent of Education, the two schools are "being operated under one administration now as more or less a single college." The Court concludes that Calhoun Community and Athens College operate in tandem as a four-year college.

The main campus of Calhoun Community College is located in Decatur, Morgan County, approximately ten miles from the main campus of Athens State in Limestone County. Athens State's main campus is roughly twenty miles from the main campus of A & M; and Calhoun Community College's main campus is even closer to A & M.

Calhoun State Junior College was established post-*Brown* and its enrollment was limited to white students until the *Lee v. Macon* decision in 1967.

In 1965, Troy State University ("TSU") set up a branch in Montgomery. Under the policy of the State Board of Education, TSU's Montgomery ("TSUM") branch did not accept black students until forced to do so in *Lee v. Macon.* By 1976, 27% of TSUM's 304 fulltime undergraduate students were blacks.

TSUM offers programs at the graduate and undergraduate level. It operates only evening and weekend classes. TSU operates a nursing program in Montgomery.

Since 1983, TSUM has been accredited independently of TSU.

The programs offered by TSUM largely and unnecessarily duplicate similar courses at ASU. In 1975, ACHE observed and recommended

The situation in Montgomery is further complicated by the presence of an expanding program offered by Troy State University..... In Montgomery, except for the nursing program at St. Margaret's Hospital and the law enforcement program at the Montgomery Police Academy, Troy State University should restrict its offerings to Maxwell Air Force Base. Its programs should primarily serve the needs of the military. Non-military related civilian enrollment should be strictly limited. At neither the graduate nor undergraduate level should Troy State attempt to become a third general purpose institution in Montgomery serving the general civilian population.

TSU's Board of Trustees has obviously ignored the recommendation.

In recognition of the need for a coordinated system of higher education, the Alabama legislature in 1969 created the Alabama Commission on Higher Education ("ACHE"). ACHE consists of twelve members, ten of whom are appointed by the governor (one from each congressional district, the others at large); and one each by the lieutenant governor and the speaker of the house of representatives. Members serve for nine-year terms, and their appointments must be confirmed by the state senate. ACHE serves in an advisory capacity to the legislature and the governor "... in respect to all matters pertaining to state funds for the operation and allocation of funds for capital improvements of state supported institutions of higher education." § 16–5–2 *Code of Alabama of 1975,* as amended.

ACHE is broadly charged with the duty of continuously analyzing and evaluating the present and future needs of higher education in Alabama, establishing statewide long-range planning, coordinating programs in instruction, research and public service, and submitting to the governor and the legislature annually "... a single unified budget report containing budget recommendations for separate appropriations to each of the institutions" in the state system of higher education. § 16–5–5,6,8,9 *Code of Alabama of 1975,* as amended. The commission also has the duty of "classifying and prescribing the role and scope for each public institution of higher education in Alabama," and of recommending changes in the role and scope of respective institutions "as it deems necessary and which may be agreed to by the governing board" of the affected institution. § 16–5–10(6) *Code of Alabama of 1975,* as amended.

ACHE approval is required for the establishment of new programs or units of instruction. However, any institution may bypass ACHE and go directly to the legislature for approval of the new program or unit. While the University of Alabama and Auburn, because of their status as entities created by the 1901 Constitution,[23] are not required to obtain such approval, they often seek it. The commission has established procedures and criteria for the review of new programs and units, at both the undergraduate and graduate levels. There is a peer review of proposed new undergraduate programs or units. At the

---

**23.** *Opinion of the Justices,* 417 So.2d 946 (Ala. 1982).

graduate level, proposed new programs are referred to an Advisory Council, consisting of the graduate deans of each of the institutions.

The affirmative vote of a majority of the Council is necessary for a recommendation that the program/unit be approved by the ACHE board.

The commission uses a formula process in recommending to the governor and the legislature a budget for each of the institutions. The funding formula, first used in the early seventies, has several components. Faculty salaries, teaching load, class size, differences in the costs of instruction of various subjects, and differences in the level of instruction, are all considered in the formula. The formula is based on the historical cost data of the various institutions; and to the extent that funding inequities have existed in the past, they are necessarily perpetuated in the formula approach.

In its 1975 "Planning Document Number One", ACHE established three categories of public institutions of higher learning: (1) doctoral universities, with three subclasses, (2) master's-level state universities, and (3) two-year institutions. Under this classification scheme, the University of Alabama, Auburn, UAB, UAH, and the University of South Alabama are included in Category I. ASU, A & M, and the other state universities are placed in Category II; and the community colleges comprise Category III.

Under the funding formula, Category I institutions are entitled to enhanced funding ratios because of their status. .

### III

#### The Land Grant Issue

Prior to the Civil War, the sale of public land was the chief instrument for national development policies. To encourage the development of higher education in the states, for example, Congress set aside public lands in various states for the establishment of "seminaries of learning." The University of Alabama was established pursuant to such congressional action.

The orientation and curricular of the original state universities tended to be classical.

In 1862, Congress enacted the Morrill Wade Act, which was designed to foster the development, in each state, of a

> college or colleges where the leading object shall be, without excluding other scientific and classical studies, and including military tactics, to teach such branches of learning as are related to agriculture and the mechanic arts, in such manner as the legislatures of the States may respectively prescribe, in order to promote the liberal and practical education of the industrial classes in the several pursuits and professions of life.

Towards that end, each state was entitled to 30,000 acres of land or land scrip for each of its senators and representatives in Congress in 1860. Alabama was therefore entitled to 240,000 acres for a land-grant college or colleges. Each state was required to provide the buildings for the college(s).

The Civil War delayed the application of the Morrill-Wade Act to the southern states. During Reconstruction, Mississippi accepted the Morrill Act, and designated two land-grant colleges: the University of Mississippi for whites, and Alcorn University for blacks. Morrill Act funds were divided on a 40:60 basis between the two schools. In Kentucky, South Carolina and Virginia, the First Morrill funds were allocated between black and white land grant schools.

In Alabama, although blacks requested that a land grant college be set up for them, the Legislature designated Auburn as the only state land grant school. It was not open to blacks. Therefore, blacks did not receive any of the benefits of the First Morrill Act. The experience of Alabama blacks was not uncommon in the South; and between 1872 and 1890 northern Congressmen made repeated efforts to require the Southern states to equitably divide the land grant funds. They were unsuccessful in 1872, 1875, 1884, 1886, and 1880. Finally, in 1890, Senator Morrill was successful in persuading Congress to pass the Morrill-

McComas Act, the Second Morrill Act. This act provided continuing federal appropriations; and more importantly it contained an anti-discrimination provision:

> ... no money shall be paid out under this act to any State ... for the support of college where a distinction of race or color is made in the admission of students, but the establishment and maintenance of such colleges separately for white and colored students shall be held in compliance with the provisions of this act if the funds received in such State ... be equitably divided....

The Act further provided that the "... institution for colored students shall be entitled to the benefits of this act and subject to its provisions, as much as it would have been if it had been included under the act of 1862...." The Second Morrill Act is unquestionably a "supplement" to the First Morrill Act.

Meanwhile, in recognition of the need to apply science to the problems of agricultural production, Congress enacted the Hatch Act in 1887. This act made annual appropriations to the "college or colleges" established under the First Morrill Act, "or any of the supplements to the Act, in each state for the purpose of setting up agricultural experiment stations." The Hatch Act recites that "... in any State ... in which two such colleges have been or may be so established the appropriation ... made to such States ... shall be equally divided between such colleges unless the legislature of such State ... shall otherwise direct." When the Hatch Act was passed, the southern states (except the three mentioned) had designated only white institutions as land grant colleges. The Act clearly contemplated that black land grant colleges would be thereafter designated under the Morrill Act, and it gave the legislatures the authority to equally divide the agricultural experimentation funds to include the black institutions.

Auburn was promptly designated as the sole recipient of Hatch Act funds; the black land grant college in this state has never been designated to receive, and for

that reason has not received, any such funds. To be sure, the Alabama legislature did appropriate state funds for "colored agricultural experiment stations" in 1896 at Tuskegee Institute and the Alabama State Normal School for Negroes in Montgomery; but neither of these was ever designated to receive Hatch Act funds. Their state appropriations for agricultural research were short-lived. It was only the imminency of this lawsuit that prompted the legislature in 1981, for the very first time, to appropriate a rather meager amount for agricultural research *and* extension at Alabama A & M.

By the early 1960s, Auburn was receiving approximately $1,000,000 a year under the Hatch Act alone. By the early eighties, its Hatch Act funds had increased to over $3,000,000.

In 1883, the legislature established the Alabama Agriculture Experiment Station ("AAES") and placed it at Auburn. All of its scientists and administrators are located on the main campus at Auburn. The vast majority of the academic faculty of Auburn's School of Agriculture and Biological Sciences have joint appointments with the AAES. The head of each academic department in the School of Agriculture is also the head of the corresponding research unit within the AAES. There are 773 employees of AAES.

The work of AAES is divided into three geographical districts within the state. There are 21 substations of AAES; 14 of which are manned. The 1984 state appropriation to AAES was $8,700,000. Another $3,800,000 in federal funds was obtained under the Smith-Lever Act and similar federal legislation.

The Food and Agriculture Act of 1977 (P.L. 95–113), requires the director of the State Agricultural Experiment Station in each state where land grant institutions are located, together with the chief administrative officers for agricultural research at the other eligible institutions, to jointly develop, by mutual agreement, a comprehensive program of agricultural research for the state. AAES, A & M and Tuskegee

Institute have jointly submitted the required comprehensive program to the Department of Agriculture since 1978; and they have been approved. AUX 6893, 6733, 6735. In these programs, AAES, A & M, and Tuskegee state that they, individually and as a group, "concur with and find no difficulty in the development and administration of a single comprehensive agricultural research program...." There is therefore no basis for Auburn's assertion that statewide agricultural research cannot be shared between Auburn and A & M.

Auburn is also the site of the Alabama Engineering Experiment Station.

AAES owns 15,319 acres of land outside the Auburn campus. It has three experiment fields and forest units in four counties. The book value of these off-campus holdings is $3,406,418.

Auburn's state and federally supported agricultural research over the years have had a significant impact on the economic life of Alabama. As Auburn notes, "[t]hese research activities are also essential to the quality of the University's graduate programs." GX 96.

Lacking this state and federal support for agricultural research, A & M has not achieved a land grant status comparable to Auburn.

In 1914, Congress enacted the Smith-Lever Act, 7 U.S.C. § 341 *et seq.* The statute recites, in pertinent part

> That in order to aid in diffusing among the people of the United States useful and practical information on subjects relating to agriculture and home economics, and to encourage the application of the same, there may be inaugurated in connection with the college or colleges in each State now receiving, or which may hereafter receive, the benefits of the [First Morrill Act] and of the [Second Morrill Act] agricultural extension work which shall be carried on in cooperation with the United States Department of Agriculture: *Provided,* that in any State in which two or more such colleges have been or hereafter may be established the appropriations hereinafter made to such college or colleges as the legislature of such State may direct....

Federal funds received under the Smith-Lever Act must be matched by state or local funds.

Governor Emmet O'Neal was notified by the Department of Agriculture, on May 14, 1914, of the need to designate "... the agricultural college or colleges to which the funds in this act are to go." Ten days later, the Governor met with the president of Auburn Polytechnic Institute and thereafter sent a letter to the Secretary of the Treasury designating Auburn as the sole Alabama institution to receive funds under the Smith-Lever Act. Apparently this designation was not widely known; and on June 16, President Buchanan of A & M formally applied to the Governor for a portion of the Smith-Lever funds, and simultaneously submitted a rather detailed plan and budget for the use of the funds by A & M. Upon receipt of the application, the Governor forwarded it to President Thach of Auburn for his "... opinion as to Buchanan's suggestions, and suggest[ed] form of reply."

By the time the Governor's correspondence reached President Thach, President Buchanan had already visited Thach twice concerning the matter. President Thach responded to the Governor on June 26:

> According to the Act and your certification, the work has already been established and organized in connection with the land grant college for the whites.... The funds available this year is only $10,000, and this has been appropriated by the Board of Trustees in an enlargement of the work already undertaken throughout the State. The plan includes assistance to the negro race, which will be administered by the staff of officers and specialists already employed. There is, on the part of the present organization, the keenest appreciation of the needs of the negro race, and as the funds develop every effort will be made to render all assistance possible.

There is no credible evidence of any plan of assistance for blacks by Auburn at the time.[24]

Along with various other institutes and schools, Tuskegee Normal and Industrial Institute also applied for a portion of the Smith Lever funds.[25] The Governor indicated to Dr. Washington of Tuskegee that at the time Auburn was designated, "[i]t was understood that a proper proportion of this fund should be used for the benefit of the colored farmers of the State." The Governor was ". . . of the opinion that your institute should receive a proper proportion of the fund and [I] have so written Dr. Thach, requesting him to take the matter up with you through correspondence." The Governor stated his unequivocal intention to ". . . approve any plan to which they [i.e., Dr. Thach and Dr. Washington] may agree in reference to a proper division of this fund."

Dr. Thach, with considerable indignation, wrote the Governor on July 28 and told him that as far as he (Thach) was concerned, the matter was "res adjudicata"; that Auburn had been duly designated as the recipient of the funds, that its designation was consistent with the uniform practice of the Southern states to designate the white land grant school as the sole recipient of Smith-Lever funds, and that Auburn had already approved extension plans and let contracts for the extension projects.

He concluded by offering to confer with the Governor "in person concerning the matter." The conference was unnecessary; from that point on, the Governor took the position that he had no authority in the matter.

By resolution of January 15, 1915, the Legislature ratified the action of Governor O'Neal's designation of Auburn for Smith-Lever funds.

The Alabama Cooperative Extension Service ("ACES") was established at Auburn in 1914.

For purposes of service by ACES, the State has been divided into three geographical districts. There are joint appointments between ACES and the academic faculty at Auburn.

Federal law requires that a single, comprehensive program of extension be developed for each state. P.L. 95–113 (1977). A & M, Tuskegee Institute and Auburn have since entered into such a plan. The plan requires the institutions, among other things

"D. To take the necessary steps to effect a jont Extension program at the county, district, and state levels.

G. To develop organizational structures at the county, district and state levels that promote unified programs and discourage fragmentary of duplicative programs.

AUX 6699, p. 3.

The three integral components of any viable land grant university are instruction, research, and extension. The former director of the Alabama Cooperative Extension Service correctly analogized:

It's like love and marriage, you can't have one without the other. . . . You can't have a land grant concept unless you have the three pieces, teaching, research and extension.

Auburn's facilities for agricultural instruction, research, and extension are vastly superior to those of A & M. Suffice it to say that the respective facilities are incomparable. These differences are principally the product of racial discrimination.

Until 1982, the legislature appropriated no money whatever to A & M for agricultural research and extension.

---

24. The Auburn plan, for example, included "work throughout the State" in various agricultural projects, and "cooperation with the Girls' Tech. Inst., Montevallo." Letter of July 28, 1914. Of course, the Girls' Technical Institute was all-white.

25. The Smith-Lever Act by its terms restricted extension funds to land grant colleges receiving funds under the First and Second Morrill Acts.

The total sum appropriated by the legislature to A & M for these purposes in 1982–83 was equal to the sum appropriated to Auburn for such purposes in 1947. In comparison to the $300,000 appropriated to A & M in 1982–83, the legislature appropriated over $19,000,000 to Auburn for extension, research, and services.

Completely aside from its discriminatory allocation of *all* federal Hatch Act and Smith-Lever funds to Auburn and the establishment of the AAES and ACES there, the state had a duty to appropriate sufficient *state funds* to A & M so that it could engage in substantial and meaningful agricultural research and extension work. The evidence compels a conclusion that the State of Alabama never intended A & M to function as a "separate but equal" land grant college; its purpose as a land grant school was merely to insure that Auburn would continue to receive the federal funds which enabled it to become the preeminent white land grant institution in Alabama.

## IV

### Vestiges of the Dual System of Higher Education

 Having found that the State of Alabama operated a dual system of higher education at least until 1967,[26] the Court now turns to the question of whether the dual system has since been disestablished. Considerations of the racial identifiability of the students, faculty, staff, and governing boards are probative. Likewise, the factors of program duplications between proximate institutions, degree offerings, facilities, and funding are important to a determination of whether the state system of higher education has achieved unitary status.

### The University of Alabama System

The board of trustees of the University of Alabama is a largely self-perpetuating 12-member board, except for the two ex-officio members. However, each vacancy filled by the board is subject to confirmation by the state senate; and if the senate rejects a person elected to the board, then the senate fills the vacancy. Until 1982, no black had ever been elected to the board of trustees. In that year, two were elected and they are presently serving.

In June, 1969, the board of trustees established the University of Alabama System ("UAS") with three independent and autonomous campuses located respectively at Tuscaloosa ("UAT"), Birmingham, ("UAB") and Huntsville ("UAH"). Each campus has a president, appointed by the board of trustees. The presidents of the three campuses report to the Board through the Chancellor of UAS, who is the chief administrative officer of the system.

At the time this lawsuit was initiated, 12.6% of the fulltime undergraduate students at UAT were blacks; only 4% of its graduate and professional students were blacks. For entering freshmen, admissions decisions are based in part on ACT scores. To the extent that the use of ACT scores by UAT adversely impacts on black students, the intensive recruitment of black undergraduate students compensates for its use. For example, there are now over 300 black undergraduate students enrolled in the College of Engineering, due in large part to the commendable efforts of the university to generate an interest among black high school students in engineering and in attending UAT. UAT professors have demonstrated a continuing concern for the success of such students after their matriculation.

Black students are comfortable in the UAT setting; and their involvement in student activities is accepted and encouraged. Black students have served as president of the Student Government Association, Homecoming Queen, and in a number of other leadership roles on campus.

In 1982, 22 out of the 826 fulltime faculty at UAT were blacks; only 3 out of the

---

26. The Court is mindful that some of the defendant institutions admitted a few blacks pursuant to court orders prior to 1967. But the admission of one or two blacks does not signal the end of segregation.

132 parttime faculty members were blacks. The Dean of the School of Social Work is black; and blacks have occupied two endowed chairs at the University. There is an adjunct faculty exchange agreement between UAT and the predominately black Stillman College, also located in Tuscaloosa. Of the 28 new faculty members hired by the College of Arts and Sciences last year, two are black, another two are asian and one is hispanic. UAT has unsuccessfully recruited and extended offers of employment to other blacks. These efforts and offers were undertaken in good faith.

The programs and offerings of UAT do not unnecessarily duplicate programs and courses of A & M or ASU.

In 1983, blacks constituted 24% of the fulltime undergraduate enrollment at UAB; they accounted for 18% of the total enrollment there. There is no credible evidence of any impediments to the admission of blacks to UAB or to the participation by black students in the activities and affairs of the campus.

UAB's faculty statistics are somewhat bleak. Only 38 (2%) of some 1,325 persons on the fulltime faculty are black; and two of the 361 professors are black. However, more than half of the black faculty have attained tenured status; and another third is on the tenure track.

Blacks account for 11% of the professional nonfaculty at UAB; and for 35% of the other nonscience/maintenance jobs.[27] Blacks are well represented in service/maintenance job classification at UAB, accounting for 8.5 out of every 10 such employees.

The programs and courses of UAB do not unnecessarily duplicate those offered at the main campuses of A & M and ASU. To the extent that either or both of the latter schools continues to offer programs in Birmingham, they unnecessarily duplicate the programs of UAB.

Admission to the freshman class as a regular student at UAH is based on a high school grade point average of "C" and a minimum American College Testing Examination ("ACT") score of 16. Students who do not meet these requirements may be admitted under a special admissions programs.

In 1976, the first year for which such figures are disclosed in the record, 5% of the fulltime undergraduate students at UAH were blacks. Six years later, the percentage remained the same. In the 1984–85 freshman class at UAH, 7.2% of the students are blacks. UAH generally limits its recruiting to its primary service area: Madison, Marshall, Morgan, Jackson and Limestone Counties—in which blacks account for 12% of the total population.

In 1982, there were two blacks on the 194 member fulltime faculty of UAH; and an equal number on the 132 member parttime faculty.

The graduate degree program in administrative science at UAH does not unnecessarily duplicate A & M's master of business administration program.

The undergraduate and graduate teacher education and certification programs offered at UAH unnecessarily duplicate similar and older programs offered at A & M. Since the institution of certain certification and graduate programs in education by UAH, white enrollment in similar courses offered at A & M has drastically declined.

Beginning in 1969, A & M offered an undergraduate degree program in computer science technology. In 1975, it obtained ACHE approval to offer a master of science degree in computer science technology. A year later, UAH obtained ACHE approval to offer a master of science in computer science. In 1980, UAH sought ACHE approval to offer a bachelor of science degree in computer science. The staff of ACHE recommended disapproval of the program, on the ground that its implementation "... would constitute an unwarrant-

27. These include administrative, management, secretarial-clerical, technical-paraprofessional, and skilled craft jobs.

ed duplication of the existing bachelor of science program in computer science technology offered by Alabama A & M University." UAH also requested approval of a doctoral program in computer science; and again, the staff recommended disapproval of the proposed program, "without prejudice pending the submission of a statewide desegregation plan", due to "the impact of the program in the Huntsville area." SX 18. The ACHE board of directors rejected these recommendations, and subsequently approved both programs. The existence of these unnecessarily duplicative courses at UAH had the effect of reducing white enrollment in A & M's master's program in computer science from 90% in the mid-seventies to 19% at the present time.

As noted earlier, since 1967 UAH has offered a master's degree in physics. Contemporaneously in 1979, the chairman of the newly-created physics department at A & M and other A & M officials met with the president of UAH, the UAH physics department chairman, and other UAH officials and suggested that the two schools initiate a joint graduate program in physics. The UAH Officials rejected the proposal. Thereafter, in September 1979, A & M submitted to ACHE, for its approval, a proposed master of science degree program in applied physics. The proposed program would consist of two options: optics and materials science. At the urging of UAH, and its staff, ACHE initially disapproved the program in July, 1980. The staff further recommended that A & M and UAH consider a joint master's program in applied physics. Several meetings were held; and in the meanwhile ACHE hired an outside consultant, Dr. Stanley Ballard of the

University of Florida, to review A & M's proposed program.

Dr. Ballard evaluated the proposed program, and warmly endorsed the A & M proposed program.[28] In his summary, he concluded that "[t]he speciality courses in applied optics and materials science which have been planned by the A & M faculty members show understanding and originality." AMX 122. In further support of its proposed program, A & M obtained an endorsement from the Director of the Spectroscopy Laboratory at the Massachusetts Institute of Technology, who wrote:

> The proposed optics program does not appear to significantly overlap the Master's program in the 1980–81 catalog of the University of Alabama at Huntsville. The three or four background physics courses would be similar, but the extensive selection of specialty courses is not offered at UAH. As far as I can tell, a student could not obtain a specialty degree in optics based on the curriculum outlined in the UAH catalog.

Professor William B. White of the Pennsylvania State University's Materials Research Laboratory likewise strongly supported the A & M proposed program, and he also concluded that the proposed program of A & M and that offered by UAH "are by no means identical."

With these endorsements, the ACHE staff recommended approval of the A & M master's program in applied physics; and it was approved by the ACHE board on August 14, 1981.

ACHE has never approved either a program in applied physics or optics for UAH.

Since the approval of the A & M program in applied physics, the legislature has es-

---

**28.** His report indicates, *inter alia:*

The proposal is that an M.S. curriculum in applied physics be developed and initiated at Alabama A & M University. In my opinion, this would be a worthwhile project. Applied physics ... is a rapidly growing field. Modern advances in optics, electronics, materials (surely including semiconductors) and sophisticated computer backup constitute a major force in modern-day research and development in industrial and government laborato-

ries. An inclusive term that is widely used is "electro-optics. * * * The fields that A & M selected for first attention are excellent: modern optics (of course including lasers), and materials science (including applications to solar energy).

 * * * * * *

The outlines that were sent me showed a rather complete offering in optics, with some 12 courses listed.

tablished a line-item (i.e., annual) appropriation of $600,000 to UAH for the operation of an optics center. It was with this annual state appropriation that UAH was able to set up a Center for Applied Optics, and to entice Dr. John Caulfield to become its director earlier this year. Dr. Caulfield has brought with him to UAH a $9,000,000 "Star Wars" grant from the Department of Defense.

### *Auburn University*

The Board of Trustees of Auburn University consists of the governor, the state superintendent of education, two members from the congressional district in which the institution is located, and one member from each other congressional district in the state. At the time this lawsuit was filed, no black person had ever served on the board; its first black member was appointed earlier this year. Auburn University and its predecessor institutions have always been operated by a board of trustees.

In 1980–81, blacks constituted 2.09% of the undergraduate enrollment, and 5.4% of the graduate students. For the 1983–84 school year, blacks constituted 2.4% of the undergraduates and 2.1% of the fulltime graduate enrollment. The Auburn main campus has the largest student body of any college or university in the state.

Auburn hired its first fulltime black faculty member in 1970. In the next thirteen years, it hired six more, so that by 1983–84, the seven blacks accounted for .6% of the total faculty of 1,033. Generally, Auburn does not actively recruit blacks for faculty positions. The reputation of Auburn University in racial matters leaves it at a distinct disadvantage, on a competitive basis, to attract qualified black faculty.

Except for athletes, Auburn admits as regular freshmen only those applicants whose ACT scores are at least 18 and who have an overall grade point average ("GPA") of "C".[29]

The 18 ACT requirement, standing alone, effectively renders most black high school students ineligible (other than athletes), since the average ACT score of black students is only 12.7. Auburn is aware of the effect of this requirement.

The ACT requirement was first adopted by Auburn in 1962. A minimum 16 ACT was the requirement until 1968, when the minimum was raised by two points.

In 1977, Auburn's Director of Planning and Analysis completed a study entitled, "The Value of ACT and SAT Test Scores as Predictors Of First Year Performance At Auburn University." He concluded:

Both the ACT and the SAT exhibit an acceptable level of predictive validity. Used alone, either is an equally good predictor of college performance. Of equal or greater importance, though, is past performance, as measured by high school grades. Obviously, a wide variety of high school grading practices exist, but the student who receives good grades in high school typically scores high in college. This predictive relationship is at least as strong as (and generally stronger than) those obtained when the ACT and SAT are used as predictors.

Auburn University Exhibit ("AUX") 7468, p. 7.

The study also noted that although "... Auburn freshmen score very high nationally in the college aptitude tests, [they] rank rather low in first year college grade point average." *Id.*, p. 6.

Athletes seeking admission to Auburn are not subjected to the 18 ACT requirement. In fact, there is no minimum ACT or SAT score for them; and within the past five years, Auburn has admitted athletes with scores as low as 6. AMX 149.

Black student participation in campus life and activities at Auburn is at a lower level than that of any of the other state-supported institutions of higher learning.

In *Strain v. Philpott*, 331 F.Supp. 836 (M.D.Ala.1971), Auburn was found to have

---

**29.** The Admissions Officer testified that if an applicant has an overall GPA of "B", he or she

may be admitted with a minimum 16 ACT score.

discriminated against black employees of ACES:

> The racial discrimination in this case has so permeated the employment practices and services distribution of the defendants that this Court finds it necessary to enter a detailed and specific decree which will not only prohibit discrimination but will also prescribe procedures designed to prevent discrimination in the future and to correct the effects of past discrimination.

*Id.* at 844.

The decree was entered in 1971. Twelve years later, the Court wrote: "The underlying problem in this case remains the absence of a more substantial number of blacks in managerial positions at the Alabama Cooperative Extension Service."

Auburn has a 1,871 acre campus, with 71 major buildings.

The evidence tends to support the widespread perception of blacks in Alabama that, except for the presence of black athletes and the changes mandated by federal laws and regulations, Auburn's racial attitudes have changed little since the fifties.

The relevant statistics at AUM stand in stark contrast to those of the main campus of Auburn. In 1972, 3% of the undergraduate enrollment at AUM was black. By 1982, 588 (16%) of the 3,570 undergraduates enrolled there were blacks. Only 4% (15 out of 375) of its graduate students in 1972 were blacks; ten years later, the number had increased to 29 (10%) blacks out of a total graduate enrollment of 268.

The regular admissions requirements at AUM are not as high as those of the main campus. A grade point average of "C" and a minimum ACT of 16 are required for regular admissions. There are special admissions programs for students not meeting those requirements; and roughly 10% of the students are admitted under these special programs. The institution vigorously recruits black students. The student activities coordinator is black. Black students are actively involved in the campus life at AUM, one having served as president and three others as vice presidents of the student government association.

AUM hired its first fulltime black faculty members in 1971, when two were hired. By 1983, ten (5%) of the 179 fulltime faculty members were blacks, and 9% (12 out of 128) of the parttime faculty was black. In recent years, AUM has recruited blacks for faculty positions; indeed, it has attempted to recruit at ASU and Alabama A & M. Today, 13 blacks are among the 189 member fulltime faculty. A black has served as a department head; and five blacks hold tenured positions.

There is substantial needless duplication of the education and business programs offered by AUM and ASU. The presence of duplicated programs at AUM—a much newer and more attractive facility than ASU—has a negative impact on white enrollment at ASU.

### Alabama State University

As noted earlier, Alabama State University ("ASU") was removed from the control of the State Board of Education and given a separate board of trustees in 1975.

The board of trustees of ASU consists of the governor, a member from each of the state's congressional districts, and two members appointed from the state at large. There is only one white on the board of trustees (other than the governor); and the governor has generally appointed blacks (14 out of the 19 appointments) to the board.

As of 1982–83, there were 3,369 fulltime undergraduates at ASU; only 4 of whom were whites. In the 1972–73 school term, there were 50 whites among the 2,552 fulltime undergraduates. In an effort to recruit white students, ASU has offered a full scholarship to the valedictorian and salutorian of each Alabama high school. The program has been in effect since 1969; but it has been frustrated by white high school officials who respond by referring their top black students to ASU. There is no showing of involvement of white students in the campus life at ASU. There

are only 3 whites in ASU's graduate programs.

In 1982–83, whites made up 19% (37 out of 193) of the fulltime faculty at ASU. In 1979–80, whites constituted 21% of the fulltime faculty. Nearly half (18 out of 41) of the parttime faculty is white.

In *Craig v. Alabama State University,* 451 F.Supp. 1207 (M.D.Ala.1978), ASU was found to have engaged in a pattern of discrimination against whites in hiring and promotions.[30]

ASU still operates graduate programs of education in Birmingham, Mobile, Selma, and Uniontown. The programs in Birmingham and Mobile unnecessarily duplicate programs offered by UAB and USA, respectively.

### Alabama A & M University

Since 1975, A & M has operated under an independent board of trustees. The board's membership includes the governor, two members from the congressional district in which A & M is located, one member from each other congressional district in the State, and three members from the state-at-large. Two of the present members of the board are whites. Since the board was created in 1975, 12 blacks and 7 whites have been appointed to it.

During the 1982–83 school year, there were only 41 whites among the 2,977 fulltime undergraduates at A & M. There has been a gradual decrease in the white enrollment at the school over the last few years. In 1976–77, for example, whites accounted for 8% (292 out of a total of 3,375) of the undergraduate fulltime enrollment. In 1982–83, only 10% of the graduate enrollment was white; whereas only four years earlier (1978–79) 39% of the fulltime graduate enrollment was white. This decrease in white enrollment at A & M is directly attributable to the duplicative course and program offerings at UAH and Athens State-Calhoun Community Colleges.

There is substantial desegregation of A & M's faculty. As of 1983–84, 25% of the fulltime faculty was white. In the preceding four years, an average of 29% of the fulltime faculty was white.

Despite the lack of adequate agricultural facilities, A & M has completed beneficial agricultural research on triticale, remote sensing, and soybean breeding. Its significant research activities in remote sensing have continued despite attempts by state agencies to divert this research to Auburn.

A materials science research experiment of one of A & M's professors was selected for inclusion on a Space Lab 3 mission. His laboratory at A & M is an inadequate facility adjacent to the boiler room in the basement at A & M. The professor, Dr. Lal, has been commended by the governor and the legislature; but he has not received any state funding for his research activities.

A & M owns 875 acres of land, including its campus.

The extent of renovations over the last 30 years at A & M adversely affects its ability to attract white students. Vehicular and pedestrian roadways and sidewalks are in serious need of repair; buildings are boarded up. The overhead power lines, bare ground, surface erosion and parking lots interspersed among the buildings detract from A & M's overall appearance. Substantial renovations and new construction are necessary to enhance A & M's attractiveness to white students.

A & M's attempts to enhance its program offerings are discussed at pp. 67–70, *supra.*

In 1981, A & M applied for approval of a doctoral program in nutrition science. The only reason for the disapproval of the program was that

> ... the proposed program represented a request for a change in the role and scope of A & M University as outlined in *Planning Document Number One.* It

---

**30.** Most of the findings in that case relate to actions taken, or not taken, by ASU during the time that it was operated by the state board of education. There is no evidence of discrimination against whites by ASU at anytime since it was given a separate board of trustees.

was the Commissioner's opinion, any revision in role and scope for institutions should be addressed through statewide planning activities.

## University of South Alabama

The USA board of trustees consists of the governor, the state superintendent of education, three members from Mobile County, three members from the state at large, one member from each of the nine state senatorial districts in the southern third of the state. The first and only black person was appointed to the board in 1984.

By 1971, however, blacks constituted 6% of the total student body. As of 1983, 10% of the total enrollment was black. 65% of USA's 1983–84 undergraduate enrollment of 2,317 students came from Mobile County; and blacks constitute 31% of the population of the county.

An applicant for regular undergraduate admission must have an ACT score of at least 16, or a combined SAT score of at least 800. Students who do not meet this requirement may be admitted under a "limited enrollment program." Students may transfer to USA after completion of junior college, if they have maintained at least a "C" average. This transfer policy is one means by which greater numbers of black students may gain admission to USA, since the predominately black Bishop State Junior College is now operating in the Mobile area.

In addition to its College of Arts and Sciences offering 29 baccalaureate degree programs and seven master's programs, USA now has colleges of business and management, education, engineering, allied health, nursing and medicine.

USA hired its first black faculty member in 1968; in that year, it has over 120 white faculty members. As of 1983, there were 15 fulltime black faculty members and 500 whites. Five (11%) of the 44 parttime faculty members were blacks. At the undergraduate level, there was only one black professor, one black associate professor, 4 black assistant professors, and 3 black instructors.

USA has entered into a consent decree with the United States which provides for, among other things, the development and enhancement of an increased number of black faculty.

## University of Montevallo

The board of trustees of the University of Montevallo consists of the governor, the state superintendent of education (ex officio), a member from each congressional district, and two members from the state at large. The sole black member of the board was appointed in 1983.

Today, blacks constitute 9.1% of the University of Montevallo's student body; and they vigorously participate in the life of the university. There are presently nine blacks on the faculty of the university; over a dozen have been employed there over the past eight years.

The University of Montevallo has entered into a consent decree with the United States which provides for, among other things, the development and enhancement of an increased number of black faculty.

The board of trustees of the University of North Alabama consists of the governor (who is ex-officio president), the state superintendent of education, six members from the Seventh and Eighth Congresional Districts of Alabama and three members from the state at large. The trustees are appointed by the governor for twelve-year terms, and approved by the Senate. Since 1975, there has been a single black serving on the board of trustees.

Today, blacks constitute 8% of the UNA's total student population of 4,825. The school utilizes an "open door" admissions policy; and there is no evidence that the admissions policies of UNA actively discriminate against blacks or that blacks are adversely impacted by such policies. Black students are actively involved in the campus life.

Presently, there are 7 fulltime blacks on UNA's total faculty of 192. The first fulltime black faculty members were hired in

1969. There are no black administrators or professional staff members at UNA presently; although there have been as many as two such persons between the years 1976–1981.

The programs and courses of UNA do not unnecessarily duplicate those offered by A & M, due to the considerable distance between the schools.

### Jacksonville State and Livingston Universities

The Jacksonville Normal School and Livingston Female Academy and Normal School became four-year teachers colleges for whites in 1929.

The board of trustees of Jacksonville State University consists of the governor, the state superintendent of education, two members from the congressional district in which the university is located, and one member from each of the other congressional districts in the state. The board of trustees of Livingston State University is similarly constituted, except that it has four additional members, appointed from the state-at-large. The first black to serve on the Livingston board was appointed in 1981; a similar appointment to Jacksonville's board was made in 1983.

As of 1982–83, Livingston had 1,458 students; 567 (38%) of whom are black. On its 57 member faculty, there are presently no blacks. Six black persons have been hired as faculty members at Livingston since 1974, but they have all left the school for reasons unrelated to race. Other blacks have been offered positions at Livingston, but they have declined employment there, again for reasons unrelated to race.

As of 1982–83 blacks accounted for 16% of the total student population at Jacksonville. Nine (3%) of the 267 faculty members there were blacks.

Both Livingston and Jacksonville have entered into consent decrees with the United States, under whose terms the schools are obligated to implement special pro-

grams to develop and enhance black faculty over the next five years.

The programs and courses of Livingston and Jacksonville do not unnecessarily duplicate the programs of Alabama State University and Alabama A & M University because of the distances involved.

### Troy State University

The board of trustees of TSU consists of the governor, the state superintendent of education, two members from the congressional district in which the school is located, and one member from each of the other congressional districts in the state. No black has ever been appointed to TSU's board of directors.

Black enrollment at TSU's main campus has risen from 2% in 1972–74 to 19% in 1984–85. The admissions office actively and successfully recruits black students.

Unconditional undergraduate admission requires a minimum 16 ACT score and a "C" average. Conditional admission is available to applicants scoring less than 16 on the ACT but having at least a 2.3 ("C") grade point average in high school work. Without regard to ACT scores or grade point averages, TSU accepts transfers of junior college students who have maintained a "C" average for two quarters.

The programs and courses offered by TSU at its main campus and in Dothan, Alabama do not duplicate the program courses offered by Alabama State University.

The fulltime faculty of TSU's main campus consists of 5 blacks and 150 whites.

The programs and courses offered by TSUM largely and unnecessarily duplicate various programs and courses offered by ASU in Montgomery. At the undergraduate level, there are at least 15 unnecessarily duplicated programs; and an equal or greater number of duplicative courses are offered by TSUM at the graduate level.

Between 60–72% of TSUM's enrollment is white. In 1982–83, TSUM had an average of 549 fulltime students and an average of 1,502 parttime students. Its full-

time faculty consisted of one black and 25 whites.

### Athens State

Admission requirements of Athens State are simple: a degree from a regionally accredited two year institution; a diploma from a technical college or institute; or the completion of 96 quarter hours of college credit with a 2.0 grade point average on a 4.0 scale.

As of the winter quarter of 1985 Athens State had a student enrollment of 1,148; 473 of whom were enrolled on a fulltime basis. Only 5% of its students live on campus. 1,045 of its students are white; and 78 (7%) are black. Four of its 43 faculty members are blacks.

Nearly two-thirds (63%) of Athens' current students are majoring in business administration (43%) or education (20%). State Board of Education Exhibit ("SBX") 256.

The college division of Calhoun Community College had 4,126 white and 422 black (8%) students in the 1984–85 school year. Over three-fourths (78%) of the college division's students reside in either Madison County (49%) or Morgan County. Sixteen percent of the population of those two counties is black. All of its students are commuters. The college division accounts for 61% of the students at Calhoun Community College. Its faculty consists of 120 members.

Black students at Athens State have been warmly received. They participate vigorously in the activities of the college. In 1980, a black student was elected president of the Student Government Association; and black students are well represented in the activities and life of the college.

ACHE has consistently opposed the state operation of Athens State, on the ground that its courses and programs needlessly duplicate existing programs at A & M and UAH. Athens State's undergraduate programs in education, humanities and sciences, science and engineering, and business administration needlessly duplicate some 39 courses offered at A & M.

Calhoun Community College offers evening extension courses at West Lawn Middle School and Huntsville High School—both located in the City of Huntsville. As of the fall of 1983, sixteen of those courses needlessly duplicated evening courses offered by A & M. In the preceding year, 25 such courses were needless duplications. The vast majority of the 1,700 students enrolled in these Huntsville extension courses are white.

Athens State also offers courses in Huntsville, housed at Redstone Arsenal. In the 1984–85 school year, 198 students were enrolled in these courses. The overwhelming majority of these students are white.

■ The State Board of Education consists of the governor (as president and ex-officio member), and eight members elected from each of the congressional districts of the state. Prior to 1969, the members of the board were appointed by the governor from the respective congressional districts. The Board of Education has "general control and supervision of the public schools," except those institutions of higher learning having boards of trustees. § 16–3–11, *Code of Alabama of 1975*. The Board of Education adopts the "rules and regulations governing the training and certification of teachers."

There has not been a black member of the Board of Education since Reconstruction.

As mentioned earlier, the board promulgates the standards and criteria for teacher education and certification programs at all of the state's institutions of higher learning. Without prior board approval of a teacher education program, it is not eligible for either accreditation by the regional accrediting agencies or state funding. The unnecessarily duplicative education and certification programs at UAH, Athens State, AUM, and TSUM have all been approved by the State Board.

For a while during the last five years, the Board of Education administered the Emergency Secondary Scholarship Pro-

gram established by the legislature and under which prospective teachers are given two-year full scholarships to the college of their choice. During the two years that the state board administered the program (1982–83 and 1983–84), not a single black applicant was among the 36 who were awarded scholarships.

Without exception, no black has ever been appointed to the presidency or other chief administrative office in a traditionally white university or college in the state; no white has served in a similar position at ASU or A & M since 1915. With one or two exceptions, the deans of the various schools and colleges within the traditionally white universities are whites; similarly, the black universities generally have black deans.

Alabama's choice of resource allocation for facilities for the period 1965 to 1983 significantly impaired the ability of Alabama State and A & M to attract white students. In both cases, a new campus has been constructed in the very city in which the black university is located. Aside from the new campus, the new institution is in each case operated by either the University of Alabama or Auburn University—indubitably the two most prestigious schools in the state. The relative quality and quantity of the facilities and equipment of ASU and A & M leave them at a great disadvantage in competing against the proximate institutions for local white students.

Overall, both white students and traditionally white institutions are in a favorable financial position when compared with black students and traditionally black institutions in Alabama. For the period 1970–1983, ASU and A & M received less state and local appropriations per fulltime equivalent student than the University of Alabama at Tuscaloosa, Auburn, the University of Alabama at Huntsville, and Auburn University in Montgomery.

In 1982–83, the faculty at the University of Alabama and Auburn were paid, on the average, 28% more than faculty at Alabama State and A & M.

The funding formula and institutional classifications utilized by ACHE impede the disestablishment of the dual system of higher education, since they freeze in the effects of past funding and institutional discrimination against ASU and A & M.

The continued recognition of a special "constitutional status" for the University of Alabama and Auburn due to their inclusion in the 1901 Constitution, when ASU and A & M were omitted from the said Constitution for racial reasons,[31] is a vestige of the dual school system.

The student bodies of Auburn, AUM, ASU, A & M, UAH, and Athens College are still identifiable by race. The faculty of each institution in the system is identifiable by race, considering the total number of black and white faculty employed in the system and other evidence in the record.

Upon consideration of all of the evidence, the Court concludes that the State has not dismantled the dual system of higher education.

## V

### Special Defenses

◼ The State of Alabama, Auburn University, and various other defendants have asserted that there is no system of higher education in Alabama; that this case is barred by the holding in *ASTA v. College Authority,* 289 F.Supp. 784 (M.D.Ala.1968); that ASU and A & M lack standing to assert cross-claims against the State of Alabama, and that the plaintiffs have failed to exhaust their administrative remedies under Title VI.

Most of the defendants deny that there is a system of higher education in Alabama. The Alabama legislature disagrees, for in the legislation creating ACHE it expressly refers to "the state *system* of public higher education ..." § 16–5–10(2) *Code of Alabama of 1975.*

Members of the board of trustees of every defendant university are appointed

---

**31.** See *Hunter v. Underwood,* — U.S. —, 105 St.Ct. 1916, 1920–21, 85 L.Ed.2d 222 (1985).

by the governor of the state, with the sole exception of the University of Alabama. Every trustee, including those at the University of Alabama, must be confirmed by the Alabama state senate. The governor is the ex-officio chairman or president of the board of trustees of every state supported university—and as the evidence has shown clearly, that position is not merely ceremonial. With the exception of the traditionally black universities, the state superintendent of education is a member of the board of trustees of every state-supported university. Generally [32] on each board is at least one trustee appointed from each congressional district of the state.

Every university is required to submit a budget proposal to ACHE; and, in turn, ACHE is required to submit "a single, unified budget report" to the governor and the legislature.

Each new academic program or unit of instruction must be approved by ACHE; and it has the power to authorize and to regulate the off-campus offerings of the state universities.

As early as 1927, the State Board of Education was empowered to approve standards for teacher education programs at all of the state-supported colleges and universities, including those of the University of Alabama and Auburn. SBX 253–P.

Finally, in *ASTA,* the three-judge court judicially noticed that "Alabama has traditionally had a dual system of higher education"; and it found "as a fact that the dual system in higher education had not been fully dismantled." The defendants are estopped, therefore, from denying the existence of a system of higher education.

### ASTA

■ In *ASTA* a three-judge court upheld the constitutionality of the legislation establishing AUM, both on its face and as applied.

Because "... no court dealing with desegregation of institutions in the higher education area has gone farther than ordering non-discriminatory admissions," and HEW "... has also largely limited its concern to admissions policies in administering Title VI of the 1964 Civil Rights Act," the Court stated that it, too, was "reluctant *at this time* to go much beyond preventing discriminatory admissions." 289 F.Supp. at 787 (emphasis added). The Court noted that since "[h]igher education is neither free nor compulsory", it is significantly different from elementary and secondary education. It concluded that

> as long as the State and a particular institution are dealing with admissions, faculty and staff in good faith the basic requirement of the affirmative duty to dismantle the dual school system on the college level, to the extent that the system may be based upon racial considerations, is satisfied.

*Id.* at 789, 780.

The decision of the court was summarily affirmed by the United States Supreme Court. 393 U.S. 400, 89 S.Ct. 681, 21 L.Ed.2d 631 (1969).

As Judge Johnson, the author of the *ASTA* decision, has recently written:

> A summary affirmance of the Supreme Court has binding precedential effect. [Citing cases]. Yet because the court disposes of the case without explaining its reasons, the holding must be carefully limited. A summary affirmance by the Supreme Court represents approval by the Supreme Court of the judgment below but should not be taken as an endorsement of the reasoning of the lower court.

*Hardwick v. Bowers,* 760 F.2d 1202, 1207 (11th Cir.1985). Moreover,

> ... a summary disposition binds lower courts only until the Supreme Court indicates otherwise. [cites omitted].... Doctrinal developments need not take the form of an outright reversal of the earlier case. The Supreme Court may indicate its willingness to reverse or recon-

---

**32.** Only the University of North Alabama and the University of South Alabama lack at least one trustee from each congressional district of the State.

sider a prior opinion with such clarity that a lower court may properly refuse to follow what appears to be binding precedent. *Id.* at 1208–09.

This Court concludes that in affirming *ASTA*, the Supreme Court merely agreed that the statute which authorized the establishment of AUM is not unconstitutional.

Since *ASTA*, there have been doctrinal developments inconsistent with the reasoning of the panel decision. First, the same three-judge court subsequently held that new construction at the traditionally white junior colleges in Alabama could not be undertaken "until [the traditionally black] Mobile State Junior College has been transformed into a fully desegregated two year institution ...". *Lee v. Macon*, 317 F.Supp. 103 (M.D.Ala.1970). Attendance at junior colleges, just as senior colleges, is "neither free nor compulsory."

More important are two post-*ASTA* higher education decisions. In *Norris v. State Council of Higher Education*, 327 F.Supp. 1368 (E.D.Va.1971), a three-judge court enjoined the escalation of a predominately white two-year state-supported college to a four-year degree granting college, where the effect would have been to impede the desegregation of a traditionally black college in close proximity. The court there expressly declined to follow *ASTA;* and the Supreme Court summarily affirmed. *Board of Visitors v. Norris*, 404 U.S. 907, 92 S.Ct. 227, 30 L.Ed.2d 180 (1971).

More recently, in *Geier v. University of Tennessee*, 597 F.2d 1056 (6th Cir.1979), the court implicitly rejected the *ASTA* reasoning when it affirmed a district court's decision to merge the predominately black Tennessee State University with the traditionally white University of Tennessee at Nashville. The Supreme Court denied certiorari in the case. 444 U.S. 886, 100 S.Ct. 180, 62 L.Ed.2d 117 (1979).

Further, the United States Office of Education, the agency charged with administration of Title VI now requires more than open admissions. As shown earlier, the *ASTA* reasoning was based in part on the fact that HEW, prdecessor of the Office of Education, "limited its concern to admissions policies in administering Title VI." 289 F.Supp. at 787. It is precisely the newer standards of the Office of Education which precipitated this lawsuit.

Finally, the *ASTA* court indicated that much of its "... discussions were based on speculation...." *Id.* at 789. The court assumed that "... as effective desegregation plans are developed in the elementary and secondary public schools, the problem will probably resolve itself in the case of higher education." *Id.,* at 790. Seventeen years later, the sad fact is that the problem has not resolved itself. Freedom of choice in higher education, as in public school desegregation, was perhaps a necessary first step in the effort to dismantle the dual school system. But having failed to work in dismantling the dual system of higher education, the *ASTA* approach must now give way to a desegregation plan that promises realistically to work. *Geier, supra.*

■ The contention that ASU and A & M are creatures of the State of Alabama and, as such, lack standing to sue the defendants in this case requires little discussion. In *Washington v. Seattle School District No. 1*, 458 U.S. 457, 102 S.Ct. 3187, 73 L.Ed.2d 896 (1982), the Seattle, Washington School Board—no less a creature of the State of Washington than ASU and A & M are creatures of the State of Alabama—sued the State of Washington under the Fourteenth Amendment. There the Supreme Court held that the State had violated the Equal Protection Clause of the Fourteenth Amendment by the challenged legislative action. The dissent by Justice Powell never once suggests that the school board lacked standing to bring the lawsuit. Further, in the view of the court, *Monell v. NYC Dept of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), makes it clear that as bodies corporate, ASU and A & M are "persons" within the meaning of 42 U.S.C. § 1983.

There is no jurisdictional bar to the assertion of cross-claims by ASU and AUM against the other defendants.

■ With respect to the § 1983 claims in this case, there is certainly no requirement of exhaustion of remedies. *Patsy v. Board of Regents of the State of Florida,* 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982). In *University of California Regents v. Bakke,* 438 U.S. 265, 283, 284, 98 S.Ct. 2733, 2744–45, 57 L.Ed.2d 750 (1978), the Supreme Court expressly did "... not pass upon petitioner's claim that private plaintiffs under Title VI must exhaust administrative remedies;" and the Court's attention has not been directed to any subsequent case in which the Supreme Court has addressed the issue. In any event, the resort to administrative remedies under Title VI (assuming the existence of such remedies) would prove futile or inadequate. To the extent that the defendants and the plaintiffs desired to reach a voluntary agreement in this case, they have had every opportunity to do so.

By separate order, the defendants shall be required to develop and submit to the Court a plan for the dismantlement of the dual system of higher education in this state.

### ORDER

In conformity with the Memorandum of Opinion issued contemporaneously herewith, it is ORDERED that the defendants STATE OF ALABAMA, GEORGE C. WALLACE, THE ALABAMA COMMISSION ON HIGHER EDUCATION, and THE ALABAMA PUBLIC SCHOOL AND COLLEGE AUTHORITY shall submit to the Court, not later than February 14, 1986, a plan to eliminate all vestiges of the dual system of higher education in Alabama.

The plan shall utilize the United States Office of Education's "Revised Criteria Specifying the Ingredients of Acceptable Plans to Desegregate State Systems of Higher Education", published in 43 Fed. Reg. 6658 (Feb. 15, 1978). Livingston University, Jacksonville State University, the University of Montevallo, and the University of South Alabama shall not be included in the plan. Troy State University (Main Campus), the University of North Alabama, and the University of Alabama (Tuscaloosa and Birmingham) shall be included in the plan only to the extent of faculty desegregation.

Within fifteen (15) days after the submission of the plan, the affected institutions shall submit their comments or objections to the plan. Such comments or objections shall be limited to a maximum of twenty-five (25) pages.